**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email:  ltfisher@bursor.com
        slitteral@bursor.com

**MIGLIACCIO & RATHOD LLP**
Nicholas A. Migliaccio *(pro hac vice)*
Jason S. Rathod *(pro hac vice)*
412 H St., NE
Washington. D.C. 20002
Telephone: (202) 470-3520
Facsimile: (202) 800-2730
E-Mail: nmigliaccio@classlawdc.com
        jrathod@classlawdc.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL FRIEND, DAPHNE PAREAS, SCOTT SEVELAND, PATRICE SHERMAN, NESTOR ALMEIDA, ADELINA LAVECCHIA, DAN HENDERSON, MARITZA ANGELES, TIM INSELMANN, WILLIAM WEST-DAVIS, PATRICIA MEDBERRY, and HANDY COLINDREZ, individually and on behalf of all others similarly situated,<br><br>                                    Plaintiffs,<br>        v.<br><br>APPLE INC.,<br><br>                                    Defendant. | Case No. 3:21-cv-07109-VC<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. Vince Chhabria |

1

## TABLE OF CONTENTS

2

**PAGE(S)**

I.      INTRODUCTION ................................................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................................2

III.    PARTIES ..............................................................................................................................2

     A.      Plaintiffs .....................................................................................................................2

          1.      California Plaintiffs ........................................................................................2

          2.      Florida Plaintiff .............................................................................................5

          3.      Massachusetts Plaintiff ..................................................................................6

          4.      New Jersey Plaintiffs .....................................................................................7

          5.      New York Plaintiffs .....................................................................................10

          6.      North Carolina Plaintiff ...............................................................................12

          7.      Rhode Island Plaintiff ..................................................................................13

          8.      Virginia Plaintiff ..........................................................................................14

     B.      Defendant .................................................................................................................15

IV.     FACTUAL ALLEGATIONS .............................................................................................16

     A.      Apple Debuts the M1 MacBooks ............................................................................16

     B.      The Clearance Defect ..............................................................................................16

     C.      The Clearance Defect is Material to Reasonable Consumers...................................20

     D.      Apple's Knowledge of the Clearance Defect ..........................................................22

     E.      Apple Omits the Clearance Defect from its Marketing and Packaging ..................33

          1.      Apple's Product Pages and Disclosures Failed to Disclose the
               Clearance Defect ..........................................................................................33

          2.      MacBook Packaging and Accompanying Materials Failed to
               Disclose the Clearance Defect......................................................................36

V.      CLASS ACTION ALLEGATIONS ...................................................................................45

VI.     CAUSES OF ACTION.......................................................................................................48

     FIRST CAUSE OF ACTION – Violation of California's Unfair Competition
        Law, Cal. Bus. & Prof. Code § 17200, *et seq*......................................................48

SECOND CAUSE OF ACTION – Violation of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ...............................................51

THIRD CAUSE OF ACTION – Violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*............................................53

FOURTH CAUSE OF ACTION – Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* ("FDUTPA")...................55

FIFTH CAUSE OF ACTION – Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A, §§ 1, *et seq.* ...............................57

SIXTH CAUSE OF ACTION – Violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.* ("NJFCA") ..........................................59

SEVENTH CAUSE OF ACTION – Violation of the New York General Business Law § 349, N.Y. Gen. Bus. Law § 349 .......................................60

EIGHTH CAUSE OF ACTION – Violation of the New York General Business Law § 350, N.Y. Gen. Bus. Law § 350 .......................................62

NINTH CAUSE OF ACTION – Violation of the North Carolina Consumer Protection Act,, N.C. Gen. Stat. § 75-1.1, *et. seq.*......................................63

TENTH CAUSE OF ACTION – Violation of the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws §§ 6-13.1, *et seq.*...........................................64

ELEVENTH CAUSE OF ACTION – Violation of the Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196, *et. seq.* ("VCPA")............................66

TWELFTH CAUSE OF ACTION - Fraud ........................................................68

THIRTEENTH CAUSE OF ACTION – Constructive Fraud ................................69

FOURTEENTH CAUSE OF ACTION – Fraudulent Inducement ......................70

FIFTEENTH CAUSE OF ACTION – Fraudulent Concealment .........................71

SIXTEENTH CAUSE OF ACTION – Negligent Misrepresentation ..................73

SEVENTEENTH CAUSE OF ACTION – Quasi-Contract / Unjust Enrichment ........................................................................................74

PRAYER FOR RELIEF ........................................................................................75

DEMAND FOR JURY TRIAL ..............................................................................76

1       Plaintiffs Daniel Friend, Daphne Pareas, Scott Seveland, Patrice Sherman, Nestor Almeida,

2    Adelina LaVecchia, Dan Henderson, Maritza Angeles, Tim Inselmann, William West-Davis, Patricia

3    Medberry, and Handy Colindrez (collectively, "Plaintiffs") bring this action on behalf of themselves

4    and all others similarly situated against Defendant Apple, Inc. ("Apple" or "Defendant") for the

5    manufacture, marketing, detailing, distribution, and sale of the defective Apple 13.3-inch M1

6    MacBook Air and 13.3-inch M1 MacBook Pro ("M1 MacBook(s)" or "MacBook(s)").   Plaintiffs

7    make the following allegations pursuant to the investigation of counsel and based upon information

8    and belief, except as to the allegations specifically pertaining to themselves, which are based on

9    personal knowledge.

## I.  INTRODUCTION

11      1.    Plaintiffs bring this action, individually and on behalf of a class of similarly situated

12    owners of Apple's 13.3-inch M1 MacBook Air and 13.3-inch M1 MacBook Pro.  This action arises

13    from Apple's concealment of a material defect stemming from the thin display and the low clearance

14    between the top case and thin display that is central to the operation of the MacBooks, and which

15    ultimately causes the display to crack and to blotch during regular use free of user interference (the

16    "Clearance Defect" or the "Defect").

17      2.    Apple has long been aware of the defective MacBooks.  Yet, notwithstanding its

18    longstanding knowledge of the Clearance Defect, Apple routinely has refused to repair the

19    MacBooks without charge when the Defect manifests.

20      3.    Many other MacBook owners have communicated with Apple's employees and

21    agents to request that Apple remedy and/or address the Clearance Defect and/or resultant damage at

22    no expense.  Apple has failed and/or refused to do so.

23      4.    As a result of Apple's unfair, deceptive, and fraudulent business practices, owners of

24    the MacBooks, including Plaintiffs, have suffered an ascertainable loss of money and/or property

25    and/or value.  The unfair and deceptive trade practices committed by Apple were conducted in a

26    manner giving rise to substantial aggravating factors.

27      5.    Had Plaintiffs and Class members known about the Clearance Defect at the time of

28    purchase, they would not have bought the MacBooks, or would have paid substantially less for them.

6.      As a result of the Clearance Defect and the monetary costs associated with attempting to repair the damage stemming from the Clearance Defect, Plaintiffs and Class members have suffered injury in fact, incurred damages, and otherwise have been harmed by Apple's conduct.

7.      Accordingly, Plaintiffs bring this action to redress Apple's violations of the various states' consumer fraud statutes, fraud, negligent misrepresentation, and unjust enrichment.

## II.  JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed classes consist of 100 of more members; the amount in controversy exceeds $5,000,000.00, exclusive of costs and interest; and at least one plaintiff is a citizen of a state different from the defendant, which is a California corporation.

9.      This Court has personal jurisdiction over Apple because its principal place of business in located within this District and it has sufficient minimum contacts in California to render the exercise of jurisdiction by this Court proper and necessary.

10.      Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

11.      The practices described herein were conceived, reviewed, approved, and otherwise controlled from Apple's nerve center, its headquarters in Cupertino, California.  Employees at Apple's headquarters directed the production and assembly of the MacBook's hardware and software, and would have had pre-sale knowledge of the Clearance Defect.  As Apple admitted in its Form 10-K for the fiscal period that ended on October 28, 2021, "most of the Company's personnel" are in Silicon Valley.  Apple's breach of duty to Plaintiffs and the Class emanated from California.

## III.  PARTIES

### A.      Plaintiffs

#### 1.      <u>California Plaintiffs</u>

12.      Plaintiff Daniel Friend is, and at all times relevant to this action has been, a citizen of Fullerton, California.  In or around May 2021, Plaintiff Friend purchased his M1 MacBook Pro directly from Apple at its Apple Brea Mall store location.  Prior to his purchase, Mr. Friend reviewed the M1 MacBook Pro product page directly on Apple's website.  At the point of purchase, Mr. Friend

reviewed Apple's M1 MacBook Pro external packaging.  Within the period in which Plaintiff Friend could have returned his MacBook for a full refund, Mr. Friend opened the packaging for his M1 MacBook Pro, reviewed the documents inside, including the Welcome Guide, the Information Guide, and the Plastic Protective Cover, and went through the setup process with his MacBook Pro (described in detail below).

13.     Despite his reliance on that material, at no point during his review of that material did Apple inform Plaintiff Friend of the Clearance Defect.

14.     Shortly after Plaintiff Friend's purchase, and during the normal course of use of his M1 MacBook, his screen displayed horizontal lines followed shortly after by cracks, rendering the display inoperable.  Mr. Friend visited Apple's Genius Bar to have his MacBook repaired.  However, Apple informed Plaintiff Friend that it would not cover the cost of his screen, leaving him $615 out of pocket for the cost of the repair.  If Plaintiff had been told of the Clearance Defect, Plaintiff Friend would not have purchased his M1 MacBook, or would have paid substantially less.  Accordingly, Plaintiff Friend did not receive the benefit of his bargain and otherwise paid a price premium for the MacBook, amounting to injury.

15.     Despite being deceived, Plaintiff Friend wishes to and is likely to continue purchasing and using Defendant's laptops, but only if Defendant accurately discloses the Clearance Defect at the point of sale.  Although Plaintiff Friend regularly visits stores and online retailers that carry the MacBooks, because Plaintiff Friend was deceived in the past by Defendant, absent an injunction, he will be unable to rely with confidence on whether the MacBooks come substantially free of the Clearance Defect.  Therefore, Plaintiff Friend will abstain from purchasing the MacBook even though he would like to do so in the future.  In addition, members of the proposed classes run the risk of continuing to purchase the MacBooks under the faulty assumption that they will not manifest the Clearance Defect.  Until Defendant is enjoined from its deceptive marketing practices, Plaintiff Friend and other consumers will continue to bear this ongoing injury.

16.     Plaintiff Daphne Pareas is, and at all times relevant to this action has been, a citizen of Los Altos, California.  In or around November 2020, Plaintiff Pareas purchased her M1 MacBook Air directly from Apple at its online store, www.apple.com.  Prior to her purchase, Ms. Pareas

reviewed the M1 MacBook Air product page directly on Apple's website.  Within the period in which Plaintiff Pareas could have returned her MacBook for a full refund, Ms. Pareas reviewed the external packaging, reviewed the documents inside, including the Welcome Guide, the Information Guide, and the Plastic Protective Cover, and went through the setup process with her MacBook Air (described in detail below).

17.     Despite her reliance on that material, at no point during her review of that material did Apple inform Plaintiff Pareas of the Clearance Defect.

18.     Shortly after Plaintiff Pareas's purchase, and during the normal course of use of her M1 MacBook, her screen displayed cracks followed by black bars streaking across the display, rendering the display inoperable.  Ms. Pareas visited Mobile Kangaroo, an Authorized Service Provider, to have her MacBook repaired.  However, Apple informed Plaintiff Pareas that it would not cover the cost of her screen.  Given the cost of repair, Plaintiff Pareas has not had her laptop repaired and instead, has only been able to use her laptop when plugged into an external monitor.  If Plaintiff Pareas had been told of the Clearance Defect, she would not have purchased her M1 MacBook, or would have paid substantially less.  Accordingly, Plaintiff Pareas did not receive the benefit of her bargain and otherwise paid a price premium for the MacBook, amounting to injury.

19.     Despite being deceived, Plaintiff Pareas wishes to and is likely to continue purchasing and using Defendant's laptops, but only if Defendant accurately discloses the Clearance Defect at the point of sale.  Although Plaintiff Pareas regularly visits stores and online retailers that carry the MacBooks, because Plaintiff Pareas was deceived in the past by Defendant, absent an injunction, she will be unable to rely with confidence on whether the MacBooks come substantially free of the Clearance Defect.  Therefore, Plaintiff Pareas will abstain from purchasing the MacBook even though she would like to do so in the future.  In addition, members of the proposed classes run the risk of continuing to purchase the MacBooks under the faulty assumption that they will not manifest the Clearance Defect.  Until Defendant is enjoined from its deceptive marketing practices, Plaintiff Pareas and other consumers will continue to bear this ongoing injury.

### 2. Florida Plaintiff

20.     Plaintiff Scott Seveland is, and at all times relevant to this action has been, a citizen of Pompano Beach, Florida.   In or around March 2021, Plaintiff Seveland purchased his M1 MacBook Air directly from Apple at its online store, www.apple.com.   Prior to his purchase, Mr. Seveland reviewed the M1 MacBook Air product page directly on Apple's website.   Within the period in which Plaintiff Seveland could have returned his MacBook for a full refund, Mr. Seveland received reviewed the external packaging, reviewed the documents inside, including the Welcome Guide, the Information Guide, and the Plastic Protective Cover, and went through the setup process with his MacBook Air (described in detail below).

21.     Despite his reliance on that material, at no point during his review of that material did Apple inform Plaintiff Seveland of the Clearance Defect.

22.     Shortly after Plaintiff Seveland's purchase, and during the normal course of use of his M1 MacBook, his screen displayed black bars followed by cracks, rendering the display inoperable. Mr. Seveland visited an Apple store located in Palm Beach, Florida to have his MacBook repaired. However, Apple informed Plaintiff Seveland that it would not cover the cost of his screen, leaving him $428 out of pocket for the cost of the repair.   If Plaintiff Seveland had been told of the Clearance Defect, he would not have purchased his M1 MacBook, or would have paid substantially less.

23.     Despite being deceived, Plaintiff Seveland wishes to and is likely to continue purchasing and using Defendant's laptops, but only if Defendant accurately discloses the Clearance Defect at the point of sale of the laptops.   Although Plaintiff Seveland regularly visits stores and online retailers that carry the MacBooks, because Plaintiff Seveland was deceived in the past by Defendant, absent an injunction, he will be unable to rely with confidence on whether the MacBooks come substantially free of the Clearance Defect.   Therefore, Plaintiff Seveland will abstain from purchasing the MacBook even though he would like to do so in the future.   In addition, members of the proposed classes run the risk of continuing to purchase the MacBooks under the faulty assumption that they will not manifest the Clearance Defect.   Until Defendant is enjoined from its deceptive marketing practices, Plaintiff Seveland and other consumers will continue to bear this ongoing injury.

### 3.      Massachusetts Plaintiff

24.      Plaintiff Patrice Sherman is, and at all times relevant to this action has been, a citizen of Cambridge, Massachusetts.   In or around May 2021, Plaintiff Sherman purchased her M1 MacBook Air directly from Apple at its online store, www.apple.com.   Prior to her purchase, Ms. Sherman reviewed the M1 MacBook Air product page directly on Apple's website.   Within the period in which Plaintiff Sherman could have returned her MacBook for a full refund, Ms. Sherman reviewed the external packaging, reviewed the documents inside, including the Welcome Guide, the Information Guide, and the Plastic Protective Cover, and went through the setup process with her MacBook Air (described in detail below).

25.      Despite her reliance on that material, at no point during her review of that material did Apple inform Plaintiff Sherman of the Clearance Defect.

26.      Shortly after Plaintiff Sherman's purchase, and during the normal course of use of her M1 MacBook, her screen displayed black bars followed by cracks, rendering the display very difficult to operate.   Ms. Sherman visited Apple's CambridgeSide store to have her MacBook repaired.   However, Apple informed Plaintiff Sherman that it would not cover the cost of her screen, leaving Plaintiff Sherman $428 out of pocket for the cost of the repair.   If Plaintiff Sherman had been told of the Clearance Defect, she would not have purchased her M1 MacBook, or would have paid substantially less.   Accordingly, Plaintiff Sherman did not receive the benefit of her bargain and otherwise paid a price premium for the MacBook, amounting to injury.

27.      Despite being deceived, Plaintiff Sherman wishes to and is likely to continue purchasing and using Defendant's laptops, but only if Defendant accurately discloses the Clearance Defect at the point of sale of the laptops.   Although Plaintiff Sherman regularly visits stores and online retailers that carry the MacBooks, because Plaintiff Sherman was deceived in the past by Defendant, absent an injunction, she will be unable to rely with confidence on whether the MacBooks come substantially free of the Clearance Defect.   Therefore, Plaintiff Sherman will abstain from purchasing the MacBook Air even though she would like to do so in the future.   In addition, members of the proposed classes run the risk of continuing to purchase the MacBooks under the faulty assumption that they will not manifest the Clearance Defect.   Until Defendant is enjoined from its

1   deceptive marketing practices, Plaintiff Sherman and other consumers will continue to bear this

2   ongoing injury.

3   **4.      New Jersey Plaintiffs**

4          28.     Plaintiff Nestor Almeida is, and at all times relevant to this action has been, a citizen

5   of Belleville, New Jersey.  In or around January 2021, Plaintiff Almeida purchased his M1 MacBook

6   Pro directly from Apple at its online store, www.apple.com.  Prior to his purchase, Mr. Almeida

7   reviewed the M1 MacBook Pro product page directly on Apple's website.  Within the period in

8   which Plaintiff Almeida could have returned his MacBook for a full refund, Mr. Almeida reviewed

9   the external packaging, reviewed the documents inside, including the Welcome Guide, the

10  Information Guide, and the Plastic Protective Cover, and went through the setup process with his

11  MacBook Air (described in detail below).

12         29.     Despite his reliance on that material, at no point during his review of that material did

13  Apple inform Plaintiff Almeida of the Clearance Defect.

14         30.     Shortly after Plaintiff Almeida's purchase, and during the normal course of use of his

15  M1 MacBook, his screen displayed magenta squares followed by the screen going black, rendering

16  the display inoperable.  Mr. Almeida visited an Apple store located in State Island, New York to

17  have his MacBook repaired.  However, Apple informed Plaintiff Almeida that it would not cover the

18  cost of his screen, otherwise leaving him out of pocket for the cost of repair or replacement.  If

19  Plaintiff Almeida had been told of the Clearance Defect, he would not have purchased his M1

20  MacBook, or would have paid substantially less.  Accordingly, Plaintiff Almeida did not receive the

21  benefit of his bargain and otherwise paid a price premium for the MacBook, amounting to injury.

22         31.     Despite being deceived, Plaintiff Almeida wishes to and is likely to continue

23  purchasing and using Defendant's laptops, but only if Defendant accurately discloses the Clearance

24  Defect at the point of sale of the laptops.  Although Plaintiff Almeida regularly visits stores and

25  online retailers that carry the MacBooks, because Plaintiff Almeida was deceived in the past by

26  Defendant, absent an injunction, he will be unable to rely with confidence on whether the MacBooks

27  come substantially free of the Clearance Defect.  Therefore, Plaintiff Almeida will abstain from

28  purchasing the MacBook even though he would like to do so in the future.  In addition, members of

---

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    7
CASE NO. 3:21-CV-07109-VC

the proposed classes run the risk of continuing to purchase the MacBooks under the faulty assumption that they will not manifest the Clearance Defect. Until Defendant is enjoined from its deceptive marketing practices, Plaintiff Almeida and other consumers will continue to bear this ongoing injury.

32.    Plaintiff Adelina LaVecchia is, and at all times relevant to this action has been, a citizen of Middlesex, New Jersey. In or around January 2021, Plaintiff LaVecchia purchased her M1 MacBook Pro from a BestBuy located in Bridgewater, New Jersey. Prior to her purchase, Ms. LaVecchia reviewed the M1 MacBook Pro product page directly on Apple's website. At the point of purchase, Ms. LaVecchia reviewed Apple's M1 MacBook Pro external packaging. Within the period in which Plaintiff LaVecchia could have returned her MacBook for a full refund, Ms. LaVecchia opened the packaging for her M1 MacBook Pro, reviewed the documents inside, including the Welcome Guide, the Information Guide, and the Plastic Protective Cover, and went through the setup process with her MacBook Pro (described in detail below).

33.    Despite her reliance on that material, at no point during her review of that material did Apple inform Plaintiff LaVecchia of the Clearance Defect.

34.    Shortly after Plaintiff LaVecchia's purchase, and during the normal course of use of her M1 MacBook, her screen developed internal cracks accompanied by blue and purple discoloration spread across the screen, rendering the display inoperable. Ms. LaVecchia visited an Apple store located in Bridgewater, New Jersey to have her MacBook repaired. However, Apple informed Plaintiff LaVecchia that it would not cover the cost of her screen, leaving Plaintiff LaVecchia $578 out of pocket for the cost of the repair. If Plaintiff LaVecchia had been told of the Clearance Defect, she would not have purchased her M1 MacBook, or would have paid substantially less. Accordingly, Plaintiff LaVecchia did not receive the benefit of her bargain and otherwise paid a price premium for the MacBook, amounting to injury.

35.    Despite being deceived, Plaintiff LaVecchia wishes to and is likely to continue purchasing and using Defendant's laptops, but only if Defendant accurately discloses the Clearance Defect at the point of sale of the laptops. Although Plaintiff LaVecchia regularly visits stores and online retailers that carry the MacBooks, because Plaintiff LaVecchia was deceived in the past by

Defendant, absent an injunction, she will be unable to rely with confidence on whether the MacBooks come substantially free of the Clearance Defect.  Therefore, Plaintiff LaVecchia will abstain from purchasing the MacBook even though she would like to do so in the future.  In addition, members of the proposed classes run the risk of continuing to purchase the MacBooks under the faulty assumption that they will not manifest the Clearance Defect.  Until Defendant is enjoined from its deceptive marketing practices, Plaintiff LaVecchia and other consumers will continue to bear this ongoing injury.

36.     Plaintiff Dan Henderson is, and at all times relevant to this action has been, a citizen of Williamstown, New Jersey.  In or around November 2020, Plaintiff Henderson purchased his M1 MacBook Air directly from Apple at its Williamstown location.  Prior to his purchase, Mr. Henderson reviewed the M1 MacBook Air product page directly on Apple's website.  At the point of purchase, Mr. Friend reviewed Apple's M1 MacBook Air external packaging.  Within the period in which Plaintiff Henderson could have returned his MacBook for a full refund, Mr. Friend opened the packaging for his M1 MacBook Air, reviewed the documents inside, including the Welcome Guide, the Information Guide, and the Plastic Protective Cover, and went through the setup process with his MacBook Pro (described in detail below).

37.     Despite his reliance on that material, at no point during his review of that material did Apple inform Plaintiff Henderson of the Clearance Defect.

38.     Shortly after Plaintiff Henderson's purchase, and during the normal course of use of his M1 MacBook, his screen displayed black bars followed by cracks, rendering the display inoperable.  Mr. Henderson visited Apple's Williamstown store to have his MacBook repaired. However, Apple informed Plaintiff Henderson that it would not cover the cost of his screen, leaving him $428 out of pocket for the cost of the repair.  If Plaintiff Henderson had been told of the Clearance Defect, Plaintiff Henderson would not have purchased his M1 MacBook, or would have paid substantially less.  Accordingly, Plaintiff Henderson did not receive the benefit of his bargain and otherwise paid a price premium for the MacBook, amounting to injury.

39.     Despite being deceived, Plaintiff Henderson wishes to and is likely to continue purchasing and using Defendant's laptops, but only if Defendant accurately discloses the Clearance

1     Defect at the point of sale.  Although Plaintiff Henderson regularly visits stores and online retailers

2     that carry the MacBooks, because Plaintiff Henderson was deceived in the past by Defendant, absent

3     an injunction, he will be unable to rely with confidence on whether the MacBooks come substantially

4     free of the Clearance Defect.   Therefore, Plaintiff Henderson will abstain from purchasing the

5     MacBook even though he would like to do so in the future.  In addition, members of the proposed

6     classes run the risk of continuing to purchase the MacBooks under the faulty assumption that they

7     will not manifest the Clearance Defect.  Until Defendant is enjoined from its deceptive marketing

8     practices, Plaintiff Henderson and other consumers will continue to bear this ongoing injury.

9                              **5.     New York Plaintiffs**

10           40.     Plaintiff Maritza Angeles is, and at all times relevant to this action has been, a citizen

11    of New York, New York.   In or around December 2020, Plaintiff Angeles purchased her M1

12    MacBook Air from an Apple store located in New York, New York.  Prior to her purchase, Ms.

13    Angeles reviewed the M1 MacBook Air product page directly on Apple's website.  At the point of

14    purchase, Ms. Angeles reviewed Apple's M1 MacBook Air external packaging.  Within the period

15    in which Plaintiff Angeles could have returned her MacBook for a full refund, Ms. Angeles opened

16    the packaging for her M1 MacBook Air, reviewed the documents inside, including the Welcome

17    Guide, the Information Guide, and the Plastic Protective Cover, and went through the setup process

18    with her MacBook Air (described in detail below).

19           41.     Despite her reliance on that material, at no point during her review of that material

20    did Apple inform Plaintiff Angeles of the Clearance Defect.

21           42.     Shortly after Plaintiff Angeles's purchase, and during the normal course of use of her

22    M1 MacBook, her screen developed internal cracks, rendering the display inoperable.  Ms. Angeles

23    visited her place of purchase to have her MacBook repaired.  However, Apple informed Plaintiff

24    Angeles that it would not cover the cost of her screen.  Plaintiff Angeles has not had her laptop

25    repaired due to the out-of-pocket cost.  If Plaintiff Angeles had been told of the Clearance Defect,

26    she would not have purchased her M1 MacBook, or would have paid substantially less.  Accordingly,

27    Plaintiff Angeles did not receive the benefit of her bargain and otherwise paid a price premium for

28    the MacBook, amounting to injury.

43.    Despite being deceived, Plaintiff Angeles wishes to and is likely to continue purchasing and using Defendant's laptops, but only if Defendant accurately discloses the Clearance Defect at the point of sale of the laptops.  Although Plaintiff Angeles regularly visits stores and online retailers that carry the MacBooks, because Plaintiff Angeles was deceived in the past by Defendant, absent an injunction, she will be unable to rely with confidence on whether the MacBooks come substantially free of the Clearance Defect.  Therefore, Plaintiff Angeles will abstain from purchasing the MacBook even though she would like to do so in the future.  In addition, members of the proposed classes run the risk of continuing to purchase the MacBooks under the faulty assumption that they will not manifest the Clearance Defect.  Until Defendant is enjoined from its deceptive marketing practices, Plaintiff Angeles and other consumers will continue to bear this ongoing injury.

44.    Plaintiff Tim Inselmann is, and at all times relevant to this action has been, a citizen of Center Moriches, New York.  In or around January 2021, Plaintiff Inselmann purchased his M1 MacBook Pro online from Amazon.  Prior to his purchase, Mr. Inselmann reviewed the M1 MacBook Pro product page directly on Apple's website as well as the material set forth on the product page on Amazon.com.  Within the period in which Plaintiff Inselmann could have returned his MacBook for a full refund, Mr. Inselmann reviewed the external packaging of the MacBook Pro, opened the packaging, and reviewed the documents inside, including the Welcome Guide, the Information Guide, and the Plastic Protective Cover, and went through the setup process with his MacBook Pro (described in detail below).

45.    Despite his reliance on that material, at no point during his review of that material did Apple inform Plaintiff Inselmann of the Clearance Defect.

46.    Shortly after Plaintiff Inselmann's purchase, and during the normal course of use of his M1 MacBook, his screen displayed cracks, rendering the display inoperable.  Mr. Inselmann visited Apple's Lake Grove, New York store to have his MacBook repaired.  However, Apple informed Plaintiff Inselmann that it would not cover the cost of his screen, leaving him $460 out of pocket for the cost of the repair.  If Plaintiff Inselmann had been told of the Clearance Defect, Plaintiff Inselmann would not have purchased his M1 MacBook, or would have paid substantially

less.  Accordingly, Plaintiff Inselmann did not receive the benefit of his bargain and otherwise paid a price premium for the MacBook, amounting to injury.

47.     Despite being deceived, Plaintiff Inselmann wishes to and is likely to continue purchasing and using Defendant's laptops, but only if Defendant accurately discloses the Clearance Defect at the point of sale.  Although Plaintiff Inselmann regularly visits stores and online retailers that carry the MacBooks, because Plaintiff Inselmann was deceived in the past by Defendant, absent an injunction, he will be unable to rely with confidence on whether the MacBooks come substantially free of the Clearance Defect.  Therefore, Plaintiff Inselmann will abstain from purchasing the MacBook even though he would like to do so in the future.  In addition, members of the proposed classes run the risk of continuing to purchase the MacBooks under the faulty assumption that they will not manifest the Clearance Defect.  Until Defendant is enjoined from its deceptive marketing practices, Plaintiff Inselmann and other consumers will continue to bear this ongoing injury.

## 6.     North Carolina Plaintiff

48.     Plaintiff William West-Davis is, and at all times relevant to this action has been, a citizen of King Mountain, North Carolina.  In or around February 2021, Plaintiff West-Davis purchased his M1 MacBook Pro from Best Buy.  Prior to his purchase, Mr. West-Davis reviewed the M1 MacBook Pro product page directly on Apple's website.  At the point of purchase, Mr. Davis reviewed Apple's M1 MacBook Pro external packaging.  Within the period in which Plaintiff West-Davis could have returned his MacBook for a full refund, Mr. West-Davis opened the packaging for his M1 MacBook Pro, reviewed the documents inside, including the Welcome Guide, the Information Guide, and the Plastic Protective Cover, and went through the setup process with his MacBook Pro (described in detail below).

49.     Despite his reliance on that material, at no point during his review of that material did Apple inform Plaintiff West-Davis of the Clearance Defect.

50.     Shortly after Plaintiff West-Davis's purchase, and during the normal course of use of his M1 MacBook, his screen displayed black bars followed by cracks, rendering the display inoperable.  Mr. West-Davis visited Apple's Charlotte North Lake mall store to have his MacBook repaired.  However, Apple informed Plaintiff West-Davis that it would not cover the cost of his

screen, leaving him more than $1,000 out of pocket for the cost of the repair. If Plaintiff West-Davis had been told of the Clearance Defect, Plaintiff West-Davis would not have purchased his M1 MacBook or would have paid substantially less. Accordingly, Plaintiff West-Davis did not receive the benefit of his bargain and otherwise paid a price premium for the MacBook, amounting to injury.

51.     Despite being deceived, Plaintiff West-Davis wishes to and is likely to continue purchasing and using Defendant's laptops, but only if Defendant accurately discloses the Clearance Defect at the point of sale. Although Plaintiff West-Davis regularly visits stores and online retailers that carry the MacBooks, because Plaintiff West-Davis was deceived in the past by Defendant, absent an injunction, he will be unable to rely with confidence on whether the MacBooks come substantially free of the Clearance Defect. Therefore, Plaintiff West-Davis will abstain from purchasing the MacBook even though he would like to do so in the future. In addition, members of the proposed classes run the risk of continuing to purchase the MacBooks under the faulty assumption that they will not manifest the Clearance Defect. Until Defendant is enjoined from its deceptive marketing practices, Plaintiff West-Davis and other consumers will continue to bear this ongoing injury.

### 7.     Rhode Island Plaintiff

52.     Plaintiff Patricia Medbery is, and at all times relevant to this action has been, a citizen of Portsmouth, Rhode Island. In or around November 2020, Plaintiff Medbery purchased her M1 MacBook Pro online from Amazon. Prior to her purchase, Ms. Medbery reviewed the M1 MacBook Pro product page directly on Apple's website as well as the material set forth on the product page on Amazon.com. Within the period in which Plaintiff Medbery could have returned her MacBook for a full refund, Ms. Medbery reviewed the external packaging of the MacBook Pro, opened the packaging, and reviewed the documents inside, including the Welcome Guide, the Information Guide, and the Plastic Protective Cover, and went through the setup process with his MacBook Pro (described in detail below).

53.     Despite her reliance on that material, at no point during her review of that material did Apple inform Plaintiff Medbery of the Clearance Defect.

54.     Shortly after Plaintiff Medbery's purchase, and during the normal course of use of her M1 MacBook, her screen displayed cracks, rendering the display inoperable. Ms. Medbery called

1   Apple's customer support line to have her MacBook repaired.  However, Apple informed Plaintiff

2   Medbery that it would not cover the cost of her screen and was not quoted a repair price.  If Plaintiff

3   Medbery had been told of the Clearance Defect, Plaintiff Medbery would not have purchased her

4   M1 MacBook, or would have paid substantially less.  Accordingly, Plaintiff Medbery did not receive

5   the benefit of her bargain and otherwise paid a price premium for the MacBook, amounting to injury.

6         55.    Despite being deceived, Plaintiff Medbery wishes to and is likely to continue

7   purchasing and using Defendant's laptops, but only if Defendant accurately discloses the Clearance

8   Defect at the point of sale.  Although Plaintiff Medbery regularly visits stores and online retailers

9   that carry the MacBooks, because Plaintiff Medbery was deceived in the past by Defendant, absent

10  an injunction, she will be unable to rely with confidence on whether the MacBooks come

11  substantially free of the Clearance Defect.  Therefore, Plaintiff Medbery will abstain from purchasing

12  the MacBook even though she would like to do so in the future.  In addition, members of the proposed

13  classes run the risk of continuing to purchase the MacBooks under the faulty assumption that they

14  will not manifest the Clearance Defect.  Until Defendant is enjoined from its deceptive marketing

15  practices, Plaintiff Medbery and other consumers will continue to bear this ongoing injury.

16        **8.**   **Virginia Plaintiff**

17        56.    Plaintiff Handy Colindrez is, and at all times relevant to this action has been, a citizen

18  of Woodbridge, Virginia.  In or around December April 2021, Plaintiff Colindrez purchased her M1

19  MacBook Pro from a BestBuy located in Woodbridge.  Prior to her purchase, Ms. Colindrez reviewed

20  the M1 MacBook Pro product page directly on Apple's website.  At the point of purchase, Ms.

21  Colindrez reviewed Apple's M1 MacBook Pro external packaging.  Within the period in which

22  Plaintiff Colindrez could have returned her MacBook for a full refund, Ms. Colindrez opened the

23  packaging for her M1 MacBook Pro, reviewed the documents inside, including the Welcome Guide,

24  the Information Guide, and the Plastic Protective Cover, and went through the setup process with her

25  MacBook Pro (described in detail below).

26        57.    Despite her reliance on that material, at no point during her review of that material

27  did Apple inform Plaintiff Colindrez of the Clearance Defect.

28

58.     Shortly after Plaintiff Colindrez's purchase, and during the normal course of use of her M1 MacBook, her screen developed lines and purple squares, rendering the display inoperable. Ms. Colindrez visited a Genius Bar located in Woodbridge to have her MacBook repaired. Apple repaired her MacBook under warranty. But the same lines and squares reappeared. Ms. Colindrez returned to the Genius Bar and received a repair. However, the same lines and squares have reappeared once again. If Plaintiff Colindrez had been told of the Clearance Defect, she would not have purchased her M1 MacBook, or would have paid substantially less. Accordingly, Plaintiff Colindrez did not receive the benefit of her bargain and otherwise paid a price premium for the MacBook, amounting to injury.

59.     Despite being deceived, Plaintiff Colindrez wishes to and is likely to continue purchasing and using Defendant's laptops, but only if Defendant accurately discloses the Clearance Defect at the point of sale of the laptops. Although Plaintiff Colindrez regularly visits stores and online retailers that carry the MacBooks, because Plaintiff Colindrez was deceived in the past by Defendant, absent an injunction, she will be unable to rely with confidence on whether the MacBooks come substantially free of the Clearance Defect. Therefore, Plaintiff Colindrez will abstain from purchasing the MacBook even though she would like to do so in the future. In addition, members of the proposed classes run the risk of continuing to purchase the MacBooks under the faulty assumption that they will not manifest the Clearance Defect. Until Defendant is enjoined from its deceptive marketing practices, Plaintiff Colindrez and other consumers will continue to bear this ongoing injury.

**B.     Defendant**

60.     Defendant Apple, Inc. is incorporated under the laws of the State of California and maintains its principal place of business in Cupertino, California. In August 2018, Apple became the world's first company to record a market capitalization of $1 trillion and approximately two years later, became the first publicly traded U.S. company to surpass $2 trillion in August 2020.[1]

---

[1] Sergei Klebnikov, "Apple Becomes First U.S. Company Worth More Than $2 Trillion," *Forbes* (Aug. 19, 2020), https://www.forbes.com/sites/sergeiklebnikov/2020/08/19/apple-becomes-first-us-company-worth-more-than-2-trillion/?sh=56d534a66e6e (last accessed June 16, 2021).

## IV.  FACTUAL ALLEGATIONS

### A.    Apple Debuts the M1 MacBooks

61.    On November 10, 2021, Apple debuted the 13.3-inch M1 MacBook Air and 13.3-inch M1 MacBook Pro with a price tag of $999 and $1,299, respectively.[2]

62.    At the launch event for the MacBooks, Apple's CEO, Tim Cook, stated that "[t]he introduction of the three news Macs featuring Apple's breakthrough M1 chip represents a bold change that was years in the making, and marks a truly historic day for the Mac and for Apple."[3]

63.    Apple described the MacBook Air as a "Thin and Light Powerhouse," touting its "thin-and-light portability." It described: "With its sleek wedge-shaped design, stunning Retina display, Magic Keyboard, and astonishing level of performance thanks to M1, the new MacBook Air once again redefines what a thin and light notebook can do."[4]

64.    Apple also described the popularity of both models and the range of uses of the compact, portable laptops.  For example, with respect to the MacBook Pro, it noted that, "Students use it to power through college, and pros use it to channel their creativity."[5]

### B.    The Clearance Defect

65.    Notwithstanding Apple's momentous product release, consumers from across the world took to online forums shortly after the first sales to express their frustration that the displays of their MacBooks cracked, blacked out, or showed magenta, purple and blue lines and squares, or otherwise ceased to function altogether.  Examples of these comments are memorialized below in Section D.

66.     To assess the cause of this common and widespread occurrence, Plaintiffs' counsel consulted Dr. David Niebuhr of Niebuhr Metallurgical Engineering.  Dr. Niebuhr is a Professional Metallurgical Engineer and former Professor of Materials Engineering and current Adjunct Professor

---

[2] Apple, "Press Release: Introducing the Next Generation of Mac," Newsroom (Nov. 10, 2020), Available at https://www.apple.com/newsroom/2020/11/introducing-the-next-generation-of-mac/ (last accessed June 16, 2022).

[3] *Id.*

[4] *Id.*

[5] *Id.*

in Mechanical Engineering at California Polytechnic State University.  Dr. Niebuhr has devoted more than 25 years of his career to product development, materials selection, and design and failure analysis.

67.     Dr. Niebuhr compared the relevant models to previous MacBook models to determine what was different in the newer models and what was causing Plaintiffs' and Class members' displays to crack, black out, show magenta, purple and/or blue lines and squares, or otherwise cease to function altogether.  The evaluation of the M1 MacBook focused primarily on the materials, structural design, and behavior of the monitor during use.  Based on Dr. Niebuhr's preliminary assessment, he determined that the MacBooks suffer from a design defect that renders the display subject to cracking and screen blotching during regular use even by the most careful consumer.

68.     Specifically, Dr. Niebuhr attributes the source of the failures to the low clearance between the top case and display which, combined with the thinner display, results in the displays failing without warning or as a result of product misuse.

69.     Given the design defect, the M1 MacBook is not strong enough to support the loads the MacBook experiences through normal and foreseeable use.

70.     Dr. Niebhur examined the following MacBooks for his study: (1) M1 MacBook Pro, Model Number: A2338, Serial Number: FVHDM4JWQ05D, Year Released: 2020; (2) M1 MacBook Air, Model Number: A2337, Serial Number: FVFGKP6QQ6l4, Year Released: 2020; (3) MacBook Pro, Model Number: A1989, Serial Number: C02YWN5WLVDC, Year Released: 2019; and (4) MacBook Pro A1706, Serial Number C02VKACAHV2N, Year Released: 2017.

71.     Dr. Niebhur considered the similarities between the four laptops, which superficially look similar and have the same size display.  The image below shows the structure of a MacBook, which consists of a bottom case, a top case, and display.  The bottom and top case contain the majority of the computer's electronics (motherboard, hard drive, CPU, etc.).  The top case contains the keyboard and touchpad. The display is connected to the top case via two hinges and ribbon cables to provide the power and video signal.  The display is supported by the aluminum housing and a rubber bezel that protects the edge of the display from direct contact with the housing.  The clearance

between the edge of the display and the aluminum frame is very tight, measuring approximately 1mm.



72.     According to Dr. Niebhur, the aluminum housing that supports the display must resist flex and torque, and the housing must be stiff enough to prevent any torque from being transferred to the display itself.  The stiffness of the case is a function of its thickness.

73.     Initial measurements indicate that the M1 case is thinner by 0.15 mm when compared to the older MacBooks.  Qualitative testing of the display case indicated the M1 MacBooks deformed more for a given load.

74.     Dr. Niebhur also explains that the liquid crystal display (LCD) for the M1 MacBook appears thinner when compared to earlier generations.  Using a low power microscope, he compared the thickness of the glass covering the LCD display to the display of older MacBooks.  The glass appeared thinner by at least 0.1 mm.

75.     LCDs consist of several layers including filters, liquid crystals, and electrodes.  These layers are sandwiched between layers of glass.  Glass is inherently brittle due to the arrangement of the atoms that make up its structure.  When a load is applied, glass is unable to deform beyond a very small amount (microns).  As a result, cracks form and propagate through the structure.

76.     By making the glass of the MacBook display thinner, there is less mechanical strength and an increased propensity for fracture.  The image below shows the display as it is seated in the aluminum housing. A rubber bezel is intended to prevent metal on metal contact when the laptop is closed and to cushion the glass from making direct contact with the housing.  But the bezel is very thin and can only minimally protect the monitor from any impacts of the case.  In addition to cracks, blotches and dead areas can also appear that render the display unusable.



77.     According to Dr. Niebhur, prior MacBook models utilized the butterfly keyboard which allowed for a thinner top case (i.e. the area where the keyboard is located) due to the low travel of the keys.  The key travel, which is the distance between its default position and when it is completely depressed, was only 0.5 mm for the Butterfly design.  The travel distance for the new Magic keyboard, which is based on the pre-Butterfly scissor design, is greater than 1 mm.  As a result, the laptop had to be thicker to accommodate the new keyboard.  In order to reduce the overall thickness, the monitor and its housing appear to have been made thinner.

78.     Apple made deliberate design decisions that are at the source of the display failures. Apple's focus on making the M1 MacBooks thin increased the probability of damage to the display, including cracking and blotching.   But even though the M1 MacBooks fail under normal and foreseeable use, Apple omitted the nature of the Clearance Defect instead of disclosing it to consumers.

### C.     The Clearance Defect is Material to Reasonable Consumers and Central to the MacBooks' Function

79.     The Clearance Defect is both material to reasonable consumers' decision to purchase the MacBooks and is central to the MacBooks' function.

80.     According to Dr. Niebuhr, laptops by design are meant to be portable and used in a variety of environments and conditions.  In the normal course of use, they will be opened and closed, transported from place to place, will incur impacts, and will be exposed to dust and other particles. Subject to these normal conditions, the monitor must remain fully functional for the computer to be usable including remaining free of cracks and areas with non-functioning pixels.

81.     Numerous sources support this position.  Merriam-Webster, for example, defines a "laptop" as "a portable microcomputer having its main components (such as processor, keyboard, and display screen) integrated into a single unit capable of battery-powered operation."[6]

82.     HowStuffWorks supports this definition by drawing a distinction between a desktop computer and a laptop:

> A desktop computer includes a motherboard, video card, hard drive and other components in a large case.  The monitor, keyboard, and other peripherals connect wirelessly or with cables . . . A laptop, however, is much smaller and lighter than even the most compact PC tower.  Its screen is an integrated part of the unit, as is its keyboard.[7]

---

[6] Merriam-Webster, "Laptop," https://www.merriam-webster.com/dictionary/laptop (last visited June 16, 2022).

[7] Tracy v. Wilson and Robert Valdes, "How Laptops Work," *HowStuffWorks* (May 12, 2021), https://computer.howstuffworks.com/laptop.htm (last accessed June 16, 2022).

---

83. Cambridge Dictionary defines "laptop" as "a computer that is small enough to be carried around easily and is flat when closed."[8]  Cambridge Dictionary provides the following alternative definition: "a computer that is small enough to be carried around easily and is designed for use outside an office."[9]

84. According to Engineering360, "[t]he main advantage of a laptop is a compact form factor, facilitated by an integrated, hinged display . . . and can be transported in common toting articles, such as a briefcase or schoolbag."[10]

85. RS Web Solutions states that "[t]he first and main advantage of a laptop, in comparison with a stationary computer, is its mobility . . . . Laptops are highly portable [by] virtue of their compact size.  They can be easily taken from one place to another in a carrying case or backpack.  This is what makes them a highly convenient device that you can carry even while traveling."[11]

86. Apple itself touts the thinness and portability of the MacBooks and acknowledges that users include professionals and students, who often transport their laptops between different environments.

87. Matthew S. Smith, expert at Digital Trends, writes that because laptops are used outside of an office or other similar workstation, "[t]he display is arguably the second-most important piece of hardware in a good laptop.  After all, it's the means by which you actually use the device."[12]

---

[8] Cambridge Dictionary, "Laptop," https://dictionary.cambridge.org/us/dictionary/english/laptop (last accessed June 16, 2022).

[9] *Id.*

[10] Engineering360, "Notebook and Laptop Computers Information," https://www.globalspec.com/learnmore/industrial_computers_embedded_computer_components/mobile_computing/notebook_laptop_computers (last accessed June 16, 2022).

[11] Souvik, "The Advantages and Disadvantages of Laptops You Should Know," Techology (June 19, 2021), https://www.rswebsols.com/tutorials/technology/advantages-disadvantages-laptops#:~:text=Portability%3A,can%20carry%20even%20while%20traveling (last accessed June 16, 2022).

[12] Matthew S. Smith, "Laptop displays: Everything you need to know," *Digital Trends* (June 3, 2020), https://www.digitaltrends.com/computing/everything-you-need-to-know-about-laptop-displays/ (last accessed June 16, 2022).

88.     Brett Howse, expert at AnAndTech, writes that when purchasing a new laptop "it would be hard to argue that the display quality shouldn't be near the top.  There's no other part of a [laptop] that you're going to use more."[13]

89.     Accordingly, like Plaintiffs, consumers seeking to purchase a laptop are, at a minimum, interested in purchasing (1) an integrated unit, combining the display, keyboard, and processor; that is (2) portable, allowing the user to easily move around and travel with their unit.  In doing so, consumers reasonably expect their laptops to exist independently of external monitors for their use and to withstand the normal use involved in using their laptop, including but not limited to transporting their laptop between different environments, loading and unloading their laptops, and opening, closing, and adjusting their laptop display.

90.     However, as a result of the Clearance Defect, the MacBooks are prone to cracks and blotches that render the display and, therefore, the MacBook unusable as intended.

**D.     Apple's Knowledge of the Clearance Defect**

91.     Apple's knowledge of the Clearance Defect stems from at least nine independent sources.

92.     ***First***, Apple would have learned of the Defect through its own quality control and internal pre-release testing.   According to Greg Joswiak, Senior Vice President of Apple's Worldwide Marketing, Apple stayed true to co-founder Steve Jobs' commitment that Apple build "the whole widget."[14]   In doing so, Apple made and controlled the entire development of the MacBooks from start to finish.  As Mr. Joswiak noted in relation to the MacBooks, "[w]e've been making the whole widget for all of our products, from the iPhone to the iPads, to the watch.  This was the final element to making the whole widget on the Mac."[15]

93.     Apple's marketing materials boast of the M1 MacBooks' purportedly superior "Retina display." Defendant touts the "better picture" offered by the "brilliant Retina display" on the

---

[13] Brett Howse, "AT 101: Understanding Laptop Displays & How We Test Them," *AnAndTech* (July 10, 2018), https://www.anandtech.com/show/13054/at-101-understanding-laptop-displays (last accessed June 16, 2022).
[14] Om Malik, The Omshow Podcast (Nov. 17, 2020), https://om.co/2020/11/17/why-m1-chip-by-apple-matters/ (last accessed June 16, 2022).
[15] *Id.*

1    M1 Macbook Pro 13",[16] and the "new levels of detail and realism" and "Lifelike colors" of the Retina

2    display on the M1 Macbook Air laptops.[17] Defendant also highlights the small-bezel design of the

3    M1 MacBook Air screen, stating: "the display glass goes right to the edge of the enclosure, so nothing

4    takes away from your gorgeous view."[18]

5         94.    Defendant's marketing of the M1 MacBooks also promised superior durability,

6    proclaiming that both models are "designed to last."  Importantly, Apple stated that, "To maximize

7    durability, we assessed the [M1 MacBooks] in our Reliability Testing Lab, using rigorous testing

8    methods that simulate customers' experiences."[19]

9         95.    Indeed, Apple acknowledged that in order to maximize durability, the M1 MacBooks

10   undergo "rigorous testing methods that simulate customers' experiences … before they leave our

11   doors."[20]

12        96.    In light of this rigorous testing, Apple has long touted the M1 MacBooks as "[t]hin

13   and light … [y]et rock solid," with its "sturdy aluminum unibody design mak[ing the MacBooks]

14   sleek, durable, and ready for anything."[21]

15

16

17

18   [16] Apple.com, available at https://www.apple.com/macbook-pro-13/ (last accessed June 16, 2022).

19   [17] Apple.com, available at https://www.apple.com/macbook-air/ (last accessed September 11, 2021)

20   [18] *Id.*

21   [19] 13-Inch MacBook Air Product Environmental Report, Apple.com, available at
     https://www.apple.com/environment/pdf/products/notebooks/13-
22   inch_MacBookAir_PER_Nov2020.pdf (last accessed June 16, 2022); 13-Inch Macbook Pro
     Product Environmental Report, Apple.com, available at
23   https://www.apple.com/environment/pdf/products/notebooks/13-
     inch_MacBookPro_PER_Nov2020.pdf (last accessed June 16, 2022).

24   [20] 13-Inch MacBook Air Product Environmental Report, Apple.com, available at
     https://www.apple.com/environment/pdf/products/notebooks/13-
25   inch_MacBookAir_PER_Nov2020.pdf (last accessed May 31, 2022); 13-Inch Macbook Pro
     Product Environmental Report, Apple.com, available at
26   https://www.apple.com/environment/pdf/products/notebooks/13-
     inch_MacBookPro_PER_Nov2020.pdf (last accessed May 31, 2022).

27   [21] MacBook Air Product Page, Apple.com (Nov. 10, 2020), available at
28   https://www.apple.com/lae/macbookair/index.html (last accessed Sep. 11, 2021).

97.     Apple describes that all "Apple devices" are "heavily-tested in [its] Reliability Testing Lab."[22]

98.     As a result of Apple's tests that simulate customers' experiences, including its rigorous reliability testing, Apple knew or should have known that the M1 MacBooks were not reliable and would fail under normal and foreseeable use by consumers.

99.     Examples of Apple's testing methods used on the M1 MacBooks, which testing methods are also used on other Apple products, would have revealed the Clearance Defect.  For instance, Apple claims that in testing its iPhone, the device must go through five tests, including a "three-point bending test," a "pressure point cycling test," a "torsion test," and "real-life user studies."[23]

100.     Additionally, Apple has acknowledged that it even designs its own machinery to perform various tests on its products, including but not limited to, on the M1 MacBooks.  Kate Bergeron, Apple's VP of Ecosystem Products and Technologies, has stated "Every new product requires its own test," and that, "We have to design fixtures so we can test the product.  The team does tons and tons of work to try to characterize different designs as quickly as possible."[24]  Apple thus developed its own tests for the M1 MacBooks.  As detailed above, because Apple was focused on making the M1 MacBooks so thin, there were deliberate changes in their design from the previous models that are at the source of the display failures.

101.     In Apple's Input Design Lab, for example, in which Apple designs and tests keyboards for the MacBook, Apple employs one machine, called a "tapper," responsible for poking each keycap five times, once on each corner and once in the center, to test whether keystrokes

---

[22] https://support.apple.com/en-us/HT201624#:~:text=Apple%20devices%20are%20designed%20to,.apple.com%2Fenvironment (last accessed June 16, 2022).

[23] Lauren Goode, "Inside Apple's Secret Testing Lab (Where iPhones Are Bent All Day Long)," *Vox* (Sep. 25, 2014), https://www.vox.com/2014/9/25/11631290/inside-apples-secret-testing-labs-where-phones-are-bent-all-day-long (last accessed June 16, 2022).

[24] Steven Levy, "What I Saw Inside Apple's Top-Secret Input Lab," *Wired* (Oct. 13, 2015), https://www.wired.com/2015/10/what-i-saw-inside-apples-top-secret-input-lab/ (last accessed June 16, 2022).

register.  Another machine employed by Apple tests keyboard endurance by tapping a key up to 5 million times.[25]

102.    Real-life user studies are also a significant component of Apple's pre-release testing. Hundreds of employees are provided with pre-production units in the months leading up to a product launch and report back their experiences to Apple.

103.    Additionally, as demonstrated by Apple's disclosures set out below, Apple was conducting tests on the MacBooks as late as October 2020, just one month before the launch of the MacBooks.

104.    Thus, based on information and belief, Apple discovered the Clearance Defect while testing the MacBooks and developing machinery to test the MacBooks, prior to releasing the MacBooks into the stream of commerce.

105.    **Second**, based on information and belief, Apple had knowledge of the Clearance Defect resulting from thousands of users having reported the Defect and resulting symptoms, as outlined herein, to Apple, and having sought out repairs from Apple.  Moreover, as the consumers' comments quoted below reveal, in many cases Apple technicians adopted a uniform approach in their response to consumers: denying that the issue is widespread and refusing to cover it under warranty.

106.    **Third**, modern companies, including Apple, have "internal product recall team[s]" tasked with "implementing quality control procedures designed to reduce the risk of—and perhaps even prevent—major recall expenditures."[26]  As an example of this team's work, Apple has a concentrated page called "Apple Service Programs" housing Apple's various recalls and service programs based on Apple's internal data for each of those products.  Apple's internal reporting mechanisms would have discovered MacBook display failures stemming from the Clearance Defect.

107.    **Fourth**, online reputation management ("ORM") is now a standard business practice among most major companies, including Apple, and entails monitoring consumer forums, social media, and other sources on the internet where consumers can review or comment on consumer

---

[25] *Id.*

[26] American Society for Quality, "What Is a Product Recall?" https://asq.org/quality-resources/recalls (last accessed June 16, 2022).

services.  "Specifically, [ORM] involves the monitoring of the reputation of an individual or brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before the damage to the individual's or brand's reputation."[27]  Based on information and belief, through ORM, Apple discovered the consumer complaints, social media posts, and articles reporting the Clearance Defect, some of which are outlined below.

108.  **Fifth**, the internet is replete with complaints from consumers who have expressed dissatisfaction about the Clearance Defect, including on Apple's own forums.  Complaints regarding the Clearance Defect date at least as far back as November 2020.  A small sampling of those is included here, but the comments on just Apple's page alone runs well into the hundreds.  These complaints began almost as soon as Apple released the MacBooks and thus pre-date Plaintiffs' respective purchases of the M1 MacBook, and have continued well into the spring of 2022:

- On November 27, 2020, for example, one user took to Reddit to write the following: "opened new M1 13-inch macbook, LCD is cracked what the hell happened?  Haven't dropped it or put any pressure on it, simply sitting on my desk and opened and the screen is black with lines on it, how could this have happened?  Literally bought it a week ago[.]"

- On December 3, 2020, one user took on MacRumors.com to write the following: "working on my M1 in bed.  Put it next to me for like thirty seconds on a soft duvet to take a call.  Pick it back up to this damaged screen."  The user reported that the M1 MacBook "wasn't bumped, hit or damaged in any way.  There is no crack or mark whatsoever.  The screen is perfectly smooth, with no marks.  Just suddenly happened."

- On March 14, 2021, another user commented on Apple's Support Community page "Please Help!!  My MacBook's screen suddenly got these horizontal lines on the entire screen that get brighter and darker every other second!  I don't know what happened!!  I just got this MacBook in January[.]"[28]

- On April 20, 2021, another user commented on Apple's Support Community page, "hi I have the exact same issue at the exact same location."

---

[27] WebSolutions, "Online Reputation," https://websolutions-maine.com/online-reputation/ (last accessed June 16, 2022).
[28] Apple's consumer forum provides two buttons following each comment: (1) "Reply" and (2) "I have this question too."  As of the time of this drafting in June 2022, 705 users clicked the "I have this question too" button.

- On May 23, 2021, another user took to Apple's forum to write that "I bought a MacBook Air M1 6 months ago and the screen cracked for no apparent reason. I left my computer on the top of my desk during the night and the next day I opened it the screen had 2 small cracks on the right which damaged the functioning of the screen. I contacted an authorized apple center which told me apple warranty would not cover it as it is a contact point crack; as if I have left something the size of a rice berry between the screen and the keyboard . . . It is absurd as I have nothing like it on my desk and the computer was properly closed as usual and didn't move the whole night. More than the price of repairing it, it is frustrating that apple doesn't believe its customers."[29]

- On May 27, 2021, another user on Apple's forum wrote "Same thing happened to me. The laptop was sitting on my desk and when I opened it was broken, and showing bars. This seems to be a design flaw and it has been reported by several users on reddit[]"

- On June 3, 2021, another user on Apple's forum wrote "happen to me as well !!!! they are not willing to take responsibility ! I am not planning to give up. doesn't make any sense that a computer that is brand new and sitting on the desk can break this way. If they have problems with the retina screen they just need to admit that. I'm an Apple costumer for years and now it makes me think, maybe they became so big that they just ignoring there [sic] costumers [sic]."

- On July 14, 2021, another user took to Apple's forum to write "We bought an M1 Macbook Air 4 months ago. Last weekend my wife was watching a movie on Netflix and adjusted the screen at the end to change the viewing angle. The screen black out except for an area on the left which had bright lines in an irregular pattern." The user continued that "have taken the MBA to the local Apple store and they advise[d] me that my wife caused the pressure crack and it is not covered under warranty. Cost to repair is [$539]. This leaves a very sour taste. The screen should not break when the screen angle is changed."

- On July 29, 2021, another user took to Apple's forum to write that "As of this morning, I, too, have the same issue. Turned my M1 Macbook Pro on as usual and the screen was obviously cracked. I have done nothing to cause this."

- On August 6, 2021, another user reported on Apple's forum, "I'm in the UK. Similar story here to everybody else. Have not yet received my MacBook Pro back from repair but today £575 was taken from my back account . . . This is the 8th Apple Laptop I have owned since the early 1990s. I have never experienced this issue before and can honestly say I have not treated my current MacBook Pro any differently to the others. Clearly, the screen on this machine is too fragile. It's as simple as that. Apple needs to admit to the fault ASAP. Simply ignoring its users' growing complaints is not good enough. We expect better. We deserve better."

---

[29] As noted above, Apple's consumer forum provides two buttons following each comment: (1) "Reply" and (2) "I have this question too." As of the time of this drafting in June 2022, 1965 users clicked the "I have this question too" button.

- On August 6, 2021, another user reported on Apple's forum, "Same boat! This is the second time it happens in the same exact spot after I replaced the screen. I have only had the laptop since March 2021."

- On August 9, 2021, another user reported on Apple's forum, "I bought a M1 Pro [which was] delivered on June 22, 2021, and my screen frame broke in two weeks with no reason. I also have a Mac product bought in 2016 and never had a similar problem either. Apple should really take this problem seriously."

- On August 29, 2021, another user reported on Apple's forum that, "Similar issue with my MacBook Air. It's cracked twice now. No shell, screen protector, or camera protector. I'm extremely careful with my MacBook. I've already paid for the first repair, and I'm even willing to pay for the second, but I'm concerned that this very expensive computer will get cracked again at any point. I don't have the money or the time to continue getting this repaired."

- On September 1, 2021, another user reported on Apple's forum that, "I have the exact same issue. Took it to Apple and they said it's not covered despite there being no damage to the laptop. This is unreasonable. I had the laptop open and adjusted the angle and the screen cracked. There was no undue force applied to the screen."

- On September 10, 2021, another user reported on Apple's forum that, "This is crazy!!! So we just bought my high school daughter a MacBook Air M1 less than 20 days ago and already has a crack. It was never dropped it was just sitting on the desk. Then I googled that people are having issues with random cracking of the Mac M1 screens."

- On September 15, 2021, another user posted the below photo on Apple's forum:



1
2
3

- On September 16, 2021, another user posted the following photo on Apple's forum alongside the following caption: "This is my cracked screen.  I didn't repair it as I don't want to pay almost $750 for something that I didn't do.  I hope Apple soon recognizes that this issue is not the customer's fault and resolve the cracked screen."

4
5
6
7
8
9
10
11
12
13
14



15
16

- On September 17, 2021, another user posted the following photograph on Apple's forum:

17
18
19
20
21
22
23

- On October 27, 2021, another user reported on Apple's forum that "I had the same thing happen to my MacBook Air M1 of less than 6 months.  It is extremely disappointing Apple Warranty does not cover the cost of repair.  After reading numerous postings from the Apple Community with the same issue, it is evident that there is a major design oversight.  Specifically, in trying to achieve the status of being the 'thinnest and lightest' it appears that the durability is clearly compromised (noting that I was informed by a[n] Apple Technician that in this version of the MBA they removed the protective layer from the screen).  Furthermore, if the screen is so sensitive that it cannot endure the normal course of use then Apple should clearly disclose this in the product description.  What is even more disconcerting is that after paying the $700 USD initial repair cost, it is highly probable the screen crack issue may recur given the sensitive nature of the screen design.

24
25
26
27

- On November 18, 2021, another user reported on Apple's forum, "This is my third MacBook air and it's only 6 months old. Yesterday, before I put it into my backpack, it was working. After I took it out, it has one inner crack at the bottom left corner (the glass outside is fine). I promise I did not crack it or have any debris in my laptop. It's just a normal day of using my laptop. I went to the Apple authorized service and they said I have to pay for a new screen. I was very upset and I took it back. Do you know

28

what happened? I closed it, and opened it, one more crack appeared! 100% sure no debris when closing it. I wish that Apple could help us."

- On December 28, 2021, another user reported on Apple's forum that "Just happened to my MacBook Air M1 after closing it and connecting it to the charger.  Woke up the next day and there were bands across my screen, and now day 2 the screen has gone black."

- On January 13, 2022, another user reported on Apple's forum that "I have an M1 Macbook Air that is within the warranty period (six months) and cracks have appeared in the screen display. I purchased it 6 months after it's release. No notice to me regarding the many cracked screens that have been reported. I have attached pictures of the computer and screen. It is clear to me that the cracks originate from the insufficient support the frame of the computer provides an overly thin and fragile screen design. I closed the computer, and when I opened it again the cracks were there. This M1 is my 5th Macbook purchased and I never had a screen issue. I have never placed any objects large or small between the computer keyboard and screen. The older computers, from 2004, 2009, 2011 have a solid screen whereas the M1 clearly is subject to cracks, bending and other issues caused by failure to construct a proper frame and screen that is durable."

- On January 18, 2022, another user reported on Apple's forum that "I am having the exact same issue with my MacBook Air M1. Vertical lines started to show up on my screen while I was typing at my work table. I took it to an authorized apple repair company and they said there was a very tiny crack in the screen. They were insistent that I must have caused the crack through improper handling (which I did not) which further added insult to the whole experience because I take incredible care with my laptop. They told me the only option Apple would allow is to replace the screen for $569. Which is half of the original price of the laptop. After reading multiple people's reports of the exact same issue, it is clear to me that this is a design flaw that Apple has no intention (so far) of taking responsibility for. I've received the same unhelpful run-around from customer support that others here have reported. My 2 previous Macbooks were so solid and I used them with zero hardware issues for years. I just don't understand why they would make and sell a product that is so fragile that normal everyday use would cause the screen to crack. And further, I don't understand their lack of accountability now that the issue is widely known and reported."

- On January 23, 2022, another user reported on Apple's forum that "I opened my MacBook Air and it look[s] like its got a crack on the right side but the screen does not feel cracked."

- On February 12, 2022, another user reported on Apple's forum that "All of a sudden without any reason horizontal and vertical lines started appearing on the screen of my MacBook Air M1 while listening to online classes."

- On March 7, 2022, another user reported on Apple's forum that "I am so glad I found this thread.  I left my MacBook open all night – all OK.  This morning – a cracked screen."

- On June 7, 2022, another user reported on Apple's forum that "I'm furious with Apple as well. I purchase my m1 macbook air in November 2021. No warnings in the packaging about how to avoid a cracked screen. And then 2 or 3 weeks ago, it happened. A spontaneous crack in the lower left part of my screen, with no apparent cause whatsoever, except for maybe the inherent design flaw in the macbook air. Apple take responsibility for this issue!"

109.    The fact that so many consumers have made (and continue to make) similar complaints related to the Clearance Defect indicates that the experienced symptoms resulting from the Clearance Defect were not the result of individual circumstances or user error or mistreatment, but instead a widespread, pervasive problem with the MacBooks. Instead of addressing the Defect, Apple has chosen to ignore these and many other consumer complaints.

110.    **Sixth**, Apple had knowledge of the Clearance Defect in light of the fact that user comments like those above have been deleted by Apple on Apple's forums, suggesting that Apple has been aware of and actively concealing these issues.  For example, one user reported on Apple's forum that, "I have also had multiple posts removed owing to my comment suggesting that the company who made my laptop might be aware of the design fault," while another user reported that, "My posts detailing difficulties…I have/am experiencing have been deleted as apparently they contained 'rants or complaints that weren't constructive.'"

111.    **Seventh**, Apple had knowledge of the Clearance Defect stemming from articles written on the subject.  On August 1, 2021, for example, one journalist, Alan Martin, wrote that, "Multiple reports have emerged suggesting that both the MacBook Pro M1 and MacBook Air M1's screens could be fragile enough to crack under normal use.  Discussion threads have popped up on both Reddit and Apple's own support community, with multiple accounts outlining similar cases. After closing their laptops, owners reported reopening them later to be greeted by cracks, black lines, and discoloration on their panels."[30]  Similarly, on August 2, 2021, for example, one journalist, Enrico Frahn, wrote that "[a]n increasing number of M1 MacBook Air and MacBook Pro owners say that the retina display of their Apple laptop has cracked during normal usage.  Claims like these

---

[30] Alan Martin, "MacBook M1 Screens Are Reportedly Cracking Without Warning,"  (Aug. 1, 2021), Available at https://www.tomsguide.com/news/macbook-m1-screens-are-reportedly-cracking-without-warning (last accessed Sept. 14, 2021).

can be found on the Apple Support Forums, Reddit, and Apple-centric websites like 9to5mac, which has also reported on the issue."[31] And earlier articles on the subject indicate that journalists reached out to Apple for comment.

112. **Eighth**, on August 27, 2021, Apple made its first public statement related to the issue, stating that "[t]o enable the thin design of Mac notebook computers, the clearance between the display (screen) and the top case is engineered to tight tolerances."  Apple proceeded to caution its users, suggesting that "[i]f you use a camera cover, palm rest cover, or keyboard cover with your Mac notebook, remove the cover before closing your display.  Leaving any materials on your display, keyboard, or palm rest might interfere with the display when it's closed and cause damage to your display."  Unfortunately, instead of adequately disclosing the true nature of the Clearance Defect and the limitations of the MacBooks due to the Clearance Defect, Apple shifted the blame to the user.

113. **Ninth**, in addition to its knowledge of the Clearance Defect in the MacBooks through pre-sale testing, consumer complaints, articles on the issue, and other sources as outlined herein, Apple also knew or should have known of the Clearance Defect through its detailed knowledge of display architecture as set out in its June 2020 patent application for the MacBooks' "display having optical films with bent alignment structures." *See* United States Patent Application Publication Pub. No.: U.S. 2020/0192422 A1, dated June 18, 2020.  Images from this Application are included here:



FIG. 1

FIG. 2

---

[31] Enrico Frahn, "M1 MacBook Owners Complaint That Their Screens Cracked For No Apparent Reason," NotebookCheck (Aug. 2, 2021), Available at https://www.notebookcheck.net/M1-MacBook-owners-complain-that-their-screens-cracked-for-no-apparent-reason.553114.0.html.

114.    This patent application demonstrates that Apple knew of the crucial importance of a durable display screen, display screen thickness sufficient to prevent failure, protective display cover layers to prevent display screen failure, and display screen support structures necessary to prevent display screen failure, lest the display screen fail (as is now the case) and destroy the functionality of the device.  Nonetheless, despite this knowledge, Apple released the M1 MacBook(s) without this necessary structural integrity and otherwise failed to disclose the Clearance Defect to Plaintiff and Class members, despite this knowledge.

### E.    Apple Omits the Clearance Defect from its Marketing and Packaging

115.    Despite its knowledge of the Clearance Defect, Apple has failed to provide adequate disclosures to consumers in its advertising of the MacBooks, in its packaging and accompanying materials, or within the period before consumers can return the MacBooks for a full refund.  Even though these sources contain other disclosures about the MacBooks, they do not contain information about the Clearance Defect.  In fact, multiple users on Apple's forum note that Apple includes no instructions or warnings pertaining to the Defect at the time of purchase.

### 1.    Apple's Product Pages and Disclosures Failed to Disclose the Clearance Defect

116.     Before purchasing their MacBooks, each of the Plaintiffs visited Apple's website to get an overview of Apple's respective products.

117.    Plaintiffs Pareas, Seveland, Sherman, Henderson, and Angeles visited Apple's MacBook Air Product Page.[32]

118.    Plaintiffs Friend, Almeida, LaVecchia, Inselmann, West-Davis, Medbery, and Colindrez visited Apple's MacBook Pro Product Page.[33]

119.    On the MacBook Air Product Page, Apple provides an overview of the various functions and features of the MacBook Air, as well as 23 separate disclosures regarding the MacBooks' limitations.

---

[32] *See* Apple, MacBook Air Product Page, https://web.archive.org/web/20201129221355/https://www.apple.com/macbook-air/#footnote-15 (last visited June 1, 2022).

[33] *See* Apple, MacBook Pro Product Page.

---

120.     For example, Apple writes that, "With incredible performance, custom technologies, and industry leading power efficiency[1], M1 is not just a next step for Mac – it's another level entirely."  Apple then discloses the following regarding efficiency: "Testing conducted by Apple in October 2020 using preproduction 13-inch MacBook Pro systems with Apple M1 chip and 16 GB of RAM.  Performance per watt refers to the ratio of peak CPU performance to average power consumed using select industry-standard benchmarks.  Comparison made against high-performing CPUs for notebooks and desktops commercially available at the time of testing.  Performance tests are conducted using specific computer systems and reflect the approximate performance of MacBook Pro."

121.     In other words, Apple discloses that despite advertising for the MacBook Air, Apple uses results from the MacBook Pro.

122.     As another example, Apple informs consumers of the following regarding the MacBook's battery life: "Up to 18 hours of battery life.  That's 6 more hours free of charge … Testing conducted by Apple in October 2020 using preproduction MacBook Air systems with Apple M1 Chip and 8-core CPU, configured with 8GB of RAM and 512GB SSD.  The Apple TV app movie playback test measures battery life by playing back HP 1080p content with display brightness set to 8 clicks from bottom.  Battery life varies by use and configuration.  See apple.com/batteries for more information."

123.     In other words, Apple discloses that the individual MacBook Air purchased by the consumer may not experience 18 hours of battery life.

124.     As another example, Apple informs consumers of the following regarding internet speeds: "Wi-Fi 6 up to 1.2Gb/s throughput … Speeds are based on theoretical throughput and may vary."

125.     In other words, Apple discloses that the individual MacBook Air purchased by the consumer may not experience Wi-Fi 6 with 1.2GB/s throughput.

126.     Apple informs consumers that the MacBook Air is its "thinnest, lightest notebook." However, nowhere does Apple disclose to consumers that the thinness of the MacBook makes it susceptible to the Clearance Defect.

127. As demonstrated by the 23 disclosures on the MacBook Air Product Page, and in light of Apple's knowledge of the Clearance Defect as established, *supra*, Apple could have easily informed consumers of this information, but it chose not to do so.

128. Accordingly, consumers like Plaintiffs Pareas, Seveland, Sherman, Henderson, and Angeles who visited the MacBook Air Product Page and encountered these features and disclosures prior to their purchase could have been informed and made aware of the Clearance Defect. However, Apple chose not to provide that information.

129. On the MacBook Pro Product Page, Apple also provides an overview of the various functions and features of the MacBook Pro, as well as 24 separate disclosures regarding the MacBooks' limitations.

130. For example, Apple writes that, "[The MacBook's] 8-core CPU rips through complex workflows and heavy workloads, with up to 2.8x faster processing performance than the previous generation." Apple then discloses the following relating to the MacBook's performance testing: "Testing conducted by Apple in October 2020 using preproduction 13-inch MacBook Pro systems with Apple M1 chip, as well as production 1.7GHz quad-core Intel Core i7-based 13-inch MacBook Pro systems, all configured with 16 GB RAM and 2TB SSD. Open source project built with prelease Xcode 12.2 Apple Clang 12.0.0, Ninja 1.10.0.git, and CMake 3.16.5. Performance tests are conducted using specific computer systems and reflect the approximate performance of the MacBook Pro."

131. In other words, Apple discloses that the individual MacBook Pro purchased by consumers may not experience 2.8x faster processing performance if they are not using the specific computer systems used by Apple in calculating that rate of performance.

132. As another example, Apple writes, "[The MacBook] brings the world's fastest integrated graphics in a personal computer." Apple then discloses the following: "Testing conducted by Apple in October 2020 using preproduction 13-inch MacBook Pro systems with Apple M1 chip and 16GB of RAM using select industry-standard benchmarks. Comparison made against the highest-performing integrated GPUs for notebooks and desktops commercially available at the time of testing. Integrated CPU is defined as a GPU located on a monolithic silicon die along with a CPU

and memory controller, behind a unified memory subsystem.  Performance tests are conducted using specific computer systems that reflect the approximate performance of MacBook Pro."

133.    In other words, Apple discloses that the individual MacBook Pro purchased by consumers may not have the world's fastest integrated graphics if the consumer is using different industry-standard benchmarks or using different computer systems from what Apple did to run its tests.

134.    As another example, Apple shares that the MacBook has "[u]p to 20 hours of battery life—the longest in any Mac ever."  Apple then discloses the following: "Testing conducted by Apple in October 2020 using preproduction 13-inch MacBook Pro systems with Apple M1 Chip, 7GB of RAM, and 512GB SSD.  The Apple TV app movie playback test measures battery life by playing back HP 1080p content with display brightness set to 8 clicks from bottom.  Battery life varies by using and configuration.  See apple.com/batteries for more information."

135.    In other words, Apple discloses that the individual MacBook Pro purchased by consumers may not actually experience 20 hours of battery life.

136.    Further, Apple informs consumers that, "The refined scissor mechanism [of the Magic Keyboard] delivers a responsive, comfortable, and quiet typing experience."  However, nowhere does Apple disclose to consumers that the thinness of the MacBook, combined with the thicker Magic Keyboard, makes it susceptible to the Clearance Defect.

137.    As demonstrated by the 24 disclosures on the MacBook Pro Product Page, Apple could have easily informed consumers of the Clearance Defect, but it chose not to do so.

138.    Accordingly, consumers like Plaintiffs Friend, Almeida, LaVecchia, Inselmann, West-Davis, Medbery, and Colindrez, who visited the MacBook Pro Product Page and encountered the features and disclosures prior to their purchase, could have been informed and made aware of the Clearance Defect.  However, Apple chose not to provide that information.

    **2.**    **MacBook Packaging and Accompanying Materials Failed to Disclose the Clearance Defect**

139.    Each MacBook Air and MacBook Pro is sold in a box designed and produced by Apple.  The back of the box contains various disclosures about what is included inside the box and advertises various capabilities of the MacBooks.

140.    Apple also includes two relevant documents inside the MacBooks' boxes as well as a Protective Plastic that covers the MacBooks.  The boxes for the MacBook Air and MacBook Pro are substantially similar, with the only variation pertaining to the model identifiers and the photograph of the respective MacBook on the top of the box.

### a.    MacBook Air and MacBook Pro External Packaging Failed to Disclose the Clearance Defect

141.    The MacBook Air and MacBook Pro external packaging states that the MacBooks are equipped with a "13.3-inch (diagonal) Retina LED-backlit display with True Tone technology; 2560 by 1600 pixels ● Two Thunderbolt / USB 4 ports ● Headphone jack; stereo speakers ● Touch ID ● Full-size backlit Magic Keyboard ● Wi-Fi 6 and Bluetooth 5.0 ● FaceTime HD camera ● Preinstalled macOS ● Size and weight: 0.16-0.63 by 11.97 by 8.36 inches (0.41-1.61 by 30.41 by 21.24 cm); 2.8 pounds (1.29kg) ● Meets ENERGY STAR requirements."

142.    The MacBook Air and MacBook Pro external packaging also contains certain disclosures such as, "Requires internet access; acceptance of the software license terms at apple.com/legal/sla; actual format capacity less.  Battery life and charge cycles vary by use and configuration.  1. FaceTime requires a FaceTime-enabled device for caller and recipient and internet connections."

143.    These disclosures are significant.  For example, the software license terms cover such matters as consent to the use of data, disclaimer of warranties, and California as controlling law.

144.    As noted above, Plaintiffs saw and reviewed this information at the time of sale and following their purchase and within the period in which they could return their MacBooks for a full refund.

145.    Despite numerous disclosures made by Apple on the MacBooks' external packaging, as well as ample space to do so, Apple failed to inform consumers, including Plaintiffs, of the Clearance Defect.

1
2

      **b.**     **MacBook Air and MacBook Pro Welcome Guide Failed to Disclose the Clearance Defect**

3      146.    The first document inside the MacBooks' boxes is a Welcome Guide.  The Welcome

4 Guide enumerates the various hardware features of the MacBooks, including depictions of the

5 locations of the Thunderbolt / USB 4, the headphone jack, the Touch ID, the FaceTime HD camera,

6 the Force Touch trackpad, as well information regarding the Display.  The Welcome Guide also

7 includes a disclosure of how to properly utilize the trackpad, stating that purchasers are to "[b]rush

8 with two fingers on the trackpad to scroll up, down, or sideways … [and s]wipe with two fingers to

9 flip through webpages and documents . . . ."

10     147.    An image of the Welcome Guide for the MacBook Air is included below:



148.    As noted above in each of Plaintiffs' respective allegations, Plaintiffs Henderson, Angeles, Pareas, Seveland, and Sherman saw and reviewed this information within the period in which they could return their MacBooks for a full refund.

149.    As these photographs demonstrate, despite multiple disclosures and places of information, including reference to the display, as well as ample space to do so, Apple failed to inform Plaintiffs and Class members of the Clearance Defect.

150.    An image of the MacBook Pro Welcome Guide is included below:



///

///

151.     As noted above in each of Plaintiffs' respective allegations, Plaintiffs LaVecchia, West-Davis, Colindrez, Friend, Almeida, Inselmann, and Medbery saw and reviewed this information within the period in which they could return their MacBooks for a full refund.

152.     As these photographs demonstrate, despite multiple disclosures and places of information, including reference to the display, as well as ample space to do so, Apple failed to inform Plaintiffs and Class members of the Clearance Defect.

**c.     MacBook Air and MacBook Pro Information Guide Failed to Disclose the Clearance Defect**

153.     The second document inside the MacBook boxes is an Information Guide.   The Information Guide outlines various considerations for use of the MacBooks, including Safety and Handling, Avoid Hearing Damage, Medical Device Interference, Prolonged Heat Exposure, Regulatory Information, EU / UK Compliance, Use Restriction, Energy Star Compliance, Disposal and Recycling Information, Built-in Battery and Charging, and Apple One-Year Limited Warranty.

154.     For example, under Avoid Hearing Damage, Apple informs consumers that "[t]o prevent possible hearing damage, do not listen at high volume levels for long periods."

155.     As another example, Apple informs consumers that "[y]our MacBook Air may become very warm during normal use.  It is important to keep your MacBook Air on a hard, stable, and well-ventilated work surface when in use or charging."

156.     An image of the Information Guide for the MacBook Air is included below:

///

///

///

///

///

///

///

///

///





157. As noted above in each of Plaintiffs' respective allegations, Plaintiffs Henderson, Angeles, Pareas, Seveland, and Sherman saw and reviewed this information within the period in which they could have returned their MacBooks for a full refund.

158. As these photographs demonstrate, despite multiple disclosures and places of information, including reference to "Safety and Handling," as well as ample space to do so, Apple failed to inform Plaintiffs and Class Members of the Clearance Defect.

159. An image of the Information Guide for the MacBook Pro is included below:

///

///

///

///



**MacBook Pro**

Review the MacBook Pro Essentials guide before using your MacBook Pro. View the guide at support.apple.com/guide/macbook-pro or download it from Apple Books (where available). Retain documentation for future reference.

**Safety and Handling**
See "Safety, handling, and regulatory information" in the MacBook Pro Essentials guide.

**Avoid Hearing Damage**
To prevent possible hearing damage, do not listen at high volume levels for long periods. More information about sound and hearing is available online at apple.com/sound.

**Medical Device Interference**
MacBook Pro contains magnets that may interfere with medical devices. See "Important safety information" in the MacBook Pro Essentials guide.

**Prolonged Heat Exposure**
Your MacBook Pro may become very warm during normal use. It's important to keep your MacBook Pro on a hard, stable, and well-ventilated work surface when in use or charging. Use common sense to avoid situations where your body is in prolonged contact with a device or its power adapter when it's operating or plugged into a power source, as sustained contact with warm surfaces may cause discomfort or injury. Take special care if you have a physical condition that affects your ability to detect heat against the body.

**Regulatory Information**
Regulatory certification information is available on-device. Choose Apple menu ● > About This Mac > Resources > Regulatory Certification. Additional regulatory information is in "Safety, handling, and regulatory information" in the MacBook Pro Essentials guide.

**FCC and ISED Canada Compliance**
This device complies with part 15 of the FCC Rules and ISED Canada licence-exempt RSS standard(s). Operation is subject to the following two conditions: (1) this device may not cause harmful interference, and (2) this device must accept any interference received, including interference that may cause undesired operation.

**EU / UK Compliance**
Apple Inc. hereby declares that this wireless device is in compliance with Directive 2014/53/EU and Radio Equipment Regulations 2017. A copy of the Declaration of Conformity is available at apple.com/euro/compliance. Apple's EU representative is Apple Distribution International Ltd., Hollyhill Industrial Estate, Cork, Ireland. Apple's UK representative is Apple UK Ltd., 2 Furzeground Way, Stockley Park, Middlesex, UB11 1BB.



**Use Restriction**
This device is restricted to indoor use when operating in the 5150 to 5350 MHz frequency range. This restriction applies in: AT, BE, BG, CH, CY, CZ, DE, DK, EE, EL, ES, FI, FR, HR, HU, IE, IS, IT, LI, LT, LU, LV, MT, NL, NO, PL, PT, RO, SE, SI, SK, TR, UA, UK(NI).

**ENERGY STAR® Compliance**



As an ENERGY STAR partner, Apple has determined that standard configurations of this product meet the ENERGY STAR guidelines for energy efficiency. The ENERGY STAR program is a partnership with electronic equipment manufacturers to promote energy-efficient products. Reducing energy consumption of products saves money and helps conserve valuable resources.

This computer is shipped with power management enabled, with the computer set to sleep after 10 minutes of user inactivity. To wake your computer, click the trackpad or press any key on the keyboard.

For more information about ENERGY STAR, visit energystar.gov.

**Disposal and Recycling Information**

The symbol above means that according to local laws and regulations your product and/or its battery shall be disposed of separately from household waste. When this product reaches its end of life, take it to a collection point designated by local authorities. The separate collection and recycling of your product and/or its battery at the time of disposal will help conserve natural resources and ensure that it is recycled in a manner that protects human health and the environment. For information about Apple's recycling program, recycling collection points, restricted substances, and other environmental initiatives, visit apple.com/environment.

**Built-in Battery and Charging**
Don't attempt to replace or remove the battery yourself—you may damage the battery, which could cause overheating, fire, and injury. The built-in battery should be replaced by Apple or an authorized service provider, and must be recycled or disposed of separately from household waste. Dispose of batteries according to your local environmental laws and guidelines. For information about battery recycling and replacement, go to apple.com/batteries/service-and-recycling. For information about charging, see "Important safety information" in the MacBook Pro Essentials guide.

**Software License Agreement**
Use of MacBook Pro constitutes acceptance of the Apple and third-party software license terms found at apple.com/legal/sla.

**Apple One-Year Limited Warranty Summary**
Apple warrants the included hardware product and accessories against defects in materials and workmanship for one year from the date of original retail purchase. Apple does not warrant against normal wear and tear, nor damage caused by accident or abuse. To obtain service, call Apple or visit an Apple Store or an Apple Authorized Service Provider—available service options are dependent on the country in which service is requested and may be restricted to the original country of sale. Call charges and international shipping charges may apply, depending on the location. Subject to the full terms and detailed information on obtaining service available at apple.com/legal/warranty and support.apple.com, if you submit a valid claim under this warranty, Apple will either repair, replace, or refund your hardware device at its own discretion. Warranty benefits are in addition to rights provided under local consumer laws. You may be required to furnish proof of purchase details when making a claim under this warranty.

For Australian consumers: Our goods come with guarantees that cannot be excluded under the Australian Consumer Law. You are entitled to a replacement or refund for a major failure and for compensation for any other reasonably foreseeable loss or damage. You are also entitled to have the goods repaired or replaced if the goods fail to be of acceptable quality and the failure does not amount to a major failure. Apple Pty Ltd, PO Box A2629, Sydney South NSW 1235. Tel: 133-622.

© 2021 Apple Inc. All rights reserved. Apple, the Apple logo, Mac, and MacBook Pro are trademarks of Apple Inc., registered in the U.S. and other countries. Apple Books is a trademark of Apple Inc. Apple Store is a service mark of Apple Inc., registered in the U.S. and other countries. ENERGY STAR and the ENERGY STAR mark are registered trademarks owned by the U.S. Environmental Protection Agency. Printed in XXXX.  034-04856-A

160.   As noted above in each of Plaintiffs' respective allegations, Plaintiffs LaVecchia, West-Davis, Colindrez, Friend, Almeida, Inselmann, and Medbery saw and reviewed this information within the period in which they could have returned their MacBooks for a full refund.

161.   As these photographs demonstrate, despite multiple disclosures and places of information, including reference to "Safety and Handling," as well as ample space to do so, Apple failed to inform Plaintiffs and Class members of the Clearance Defect.

> **d.    MacBook Air and MacBook Pro Protective Plastic Failed to Disclose the Clearance Defect**

162.   In addition to the Welcome Guide and Information Guide, the MacBooks also come with a thin sheet of protective plastic that covers the laptops while inside the boxes. On the protective plastic, Apple informs consumers as follows: "IMPORTANT: Use requires acceptance of the

software license terms presented electronically during setup." An image of the protective plastic for the MacBook Air and MacBook Pro is included below:



163.    As noted above in each of Plaintiffs' respective allegations, Plaintiffs Friend, Pareas, Seveland, Sherman, Almeida, LaVecchia, Henderson, Angeles, Inselmann, West-Davis, Medbery, and Colindrez saw and reviewed this information within the period in which they could have returned their MacBooks for a full refund.

164.    However, as this photograph demonstrates, despite the placement of important legal disclosures pertaining to the use of the MacBooks, Apple failed to inform Plaintiffs and Class members of the Clearance Defect.

**e.       MacBook Air and MacBook Pro Set Up Process Failed to Disclose the Clearance Defect**

165.    When the MacBooks are powered on for the first time, the user must navigate through the setup program before they can be used. The setup program greets the user, informs the user of which languages are available, sets out the country of origin, apprises the consumer of the accessibility and migration and assistant features, and then prompts the user for their Apple ID. Next, consumers are informed of the True Tone Display before completing the set-up process. Images setting forth the set-up process for the MacBooks are included below:

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



22      166.   As noted above in each of Plaintiffs' respective allegations, Plaintiffs Friend, Pareas,

23   Seveland, Sherman, Almeida, LaVecchia, Henderson, Angeles, Inselmann, West-Davis, Medbery,

24   and Colindrez completed the set-up process and were exposed to this information within the period

25   in which they could have returned their MacBooks for a full refund.

26      167.   However, as these photographs demonstrate, Apple failed to inform Plaintiffs and

27   Class members of the Clearance Defect during the set-up process, despite the ability, space, and

28   means to do so.

1

## V.  CLASS ACTION ALLEGATIONS

2       168.    Plaintiffs bring this lawsuit under Federal Rule of Civil Procedure 23(a), (b)(1),

3  (b)(2), and/or (b)(3) as representatives of the following Nationwide Class and State Subclasses

4  (collectively defined as the "Class" or "Classes"):

5          **Nationwide Class:**
6          All persons within the United States who purchased, other than for resale, a model
           year 2020 or later 13.3-inch M1 MacBook Air or M1 MacBook Pro.

7          **California Subclass:**
8          All persons who purchased, other than for resale, within California, a model year 2020
           or later 13.3-inch M1 MacBook Air or M1 MacBook Pro.

9          **Florida Subclass:**
10         All persons who purchased, other than for resale, within Florida, a model year 2020
           or later 13.3-inch M1 MacBook Air or M1 MacBook Pro.

11

12         **Massachusetts Subclass:**
           All persons who purchased, other than for resale, within Massachusetts, a model year
13         2020 or later 13.3-inch M1 MacBook Air or M1 MacBook Pro.

14         **New Jersey Subclass:**
           All persons who purchased, other than for resale, within New Jersey, a model year
15         2020 or later 13.3-inch M1 MacBook Air or M1 MacBook Pro.

16         **New York Subclass:**
           All persons who purchased, other than for resale, within New York, a model year
17         2020 or later 13.3-inch M1 MacBook Air or M1 MacBook Pro.

18         **North Carolina Subclass:**
19         All persons who purchased, other than for resale, within North Carolina, a model year
           2020 or later 13.3-inch M1 MacBook Air or M1 MacBook Pro.

20         **Rhode Island Subclass:**
21         All persons who purchased, other than for resale, within Rhode Island, a model year
           2020 or later 13.3-inch M1 MacBook Air or M1 MacBook Pro.

22         **Virginia Subclass:**
23         All persons who purchased, other than for resale, within Virginia, a model year
           2020 or later 13.3-inch M1 MacBook Air or M1 MacBook Pro.

24         169.    The following persons and entities are excluded from the Class: Apple and its officers,

25  directors, employees, subsidiaries, and affiliates; all judges assigned to this case and any members

26  of their immediate families; and the parties' counsel in this litigation.  Plaintiffs reserve the right to

27

28

---

1   modify, change, or expand the Class definition, including proposing additional subclasses, based

2   upon discovery and further investigation.

3       170.   **Numerosity.**  Apple sold tens of thousands of the M1 MacBooks.  Members of the

4   Classes are widely dispersed throughout the county.  Class members are so numerous that joinder is

5   impracticable.

6       171.   **Typicality.**  Plaintiffs' claims are typical of the claims of all Class members.

7   Plaintiffs are advancing the same legal theories on behalf of themselves and all Class members.

8   Plaintiffs, like all Class members, purchased a M1 MacBook containing the Clearance Defect.

9   Plaintiffs, like all Class members, would not have purchased, or would have paid substantially less

10  for, an M1 MacBook had they known of the Defect or that Apple would respond inadequately when

11  the Defect manifested.

12      172.   **Adequacy.**  Plaintiffs will fairly and adequately protect the interests of the Class.

13  They have no interests antagonistic to the interests of other Class members and are committed to

14  vigorously prosecuting this case.  Plaintiffs have retained competent counsel experienced in the

15  prosecution of consumer protection class actions involving defective consumer electronics.

16      173.   **Commonality and Predominance.**  Questions of law and fact common to the Class

17  members predominate over questions that may affect only individual Class members, because Apple

18  acted on grounds generally applicable to the Class as a whole.  Questions of law and fact common

19  to the Class include:

20          a.   Whether the M1 MacBook suffers from the Clearance Defect;

21          b.   Whether the Clearance Defect substantially impairs the value of the M1

22              MacBooks;

23          c.   Whether Apple knew of the Clearance Defect but continued to promote and

24              sell the MacBooks without disclosing the Defect or its consequences to

25              consumers;

26          d.   Whether a reasonable consumer would consider the Clearance Defect and its

27              consequences important to the decision whether to purchase an M1

28              MacBooks;

e. Whether Apple's omissions relating to the Clearance Defect were likely to deceive a reasonable consumer;

f. Whether Plaintiffs and Class members overpaid for their M1 MacBooks as a result of the Clearance Defect;

g. Whether Plaintiffs and Class members are entitled to equitable relief, including restitution and injunctive relief; and

h. Whether Plaintiffs and Class members are entitled to damages or other monetary relief, and if so, in what amount.

174. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of Apple's financial resources, Class members are not likely to pursue legal redress individually for the violations detailed in this complaint. Individualized litigation would significantly increase the delay and expense to all parties and to the Court and would create the potential for inconsistent and contradictory rulings. By contrast, a class action presents fewer management difficulties, allows claims to be heard which would otherwise go unheard because the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

175. Class certification is also appropriate under Rules 23(b)(1) and/or (b)(2) because:

a. The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Apple;

b. The prosecution of separate actions by individual Class members would create a risk of adjudication that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests; and

c. Apple has acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the members of the Class as a whole.

## VI.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of California's Unfair Competition Law,
Cal. Bus. & Prof. Code § 17200, *et seq.***

176.    Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

177.    Plaintiffs assert this claim under California law on behalf of the Nationwide Class or, in the alternative, the California Subclass.

178.    The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.

**Unlawful**

179.    Apple's conduct is unlawful, in violation of the UCL, because it violates the Consumers Legal Remedies Act and California's False Advertising Law.

**Unfair**

180.    Apple's conduct is unfair in violation of the UCL because it violates California public policy by placing goods in the stream of commerce while omitting information related to a material defect that goes to the core functionality of the product.

181.    Apple acted in an unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner.  Apple engaged in unfair business practices and acts in at least the following respects:

    a.    Apple promoted and sold laptops it knew were defective because they contain a display prone to failure as a result of the Clearance Defect;

    b.    Apple promoted and sold laptops with the Clearance Defect which caused the premature screen failures despite its knowledge that users do not expect the display to materially degrade over time;

    c.    Apple failed to disclose that the M1 MacBook is defective, and omitted from its website and product packaging, amongst other sources that the MacBook

possesses particular qualities that were inconsistent with Apple's actual knowledge of the product;

    d.    Apple failed to exercise adequate quality control and due diligence over the M1 MacBook before placing it on the market; and

    e.    Apple minimized the scope and severity of the problems with the MacBook, refusing to acknowledge the Clearance Defect, failing to provide adequate relief to consumers, and suggesting to consumers that their aftermarket conduct resulted in the failure of the display when Apple had actual knowledge of the true cause of the failure.

182.    The gravity of harm resulting from Apple's unfair conduct outweighs any potential utility.  The practice of selling defective laptops without providing an adequate remedy to cure the defect—and continuing to sell those laptops without full and fair disclosure of the defect—harms the public at large and is part of a common and uniform course of wrongful conduct.

183.    The harm from Apple's conduct was not reasonably avoidable by consumers.  The MacBook suffers from a latent defect, and even after receiving a large volume of consumer complaints, Apple did not disclose the Defect.  Plaintiffs did not know if, and had no reasonable means of discovering, the Clearance Defect.

184.    There were reasonably available alternatives that would have furthered Apple's business interests by satisfying and retaining its customers while maintaining profitability, such as: (1) acknowledging the Defect and providing a permanent fix for the defective laptops; (2) adequately disclosing the Defect to prospective purchasers; (3) expand the warranty for the MacBook; and (4) offering refunds or suitable non-defective replacement laptops to consumers with failed displays.

**Fraud by Omission**

185.    Apple's conduct is fraudulent in violation of the UCL because it is likely to deceive a reasonable consumer and:

    a.    Apple knowingly and intentionally concealed from Plaintiffs and Class members that the M1 MacBooks contain the Clearance Defect that renders the displays prone to failure;

b.  Apple volunteered information to Plaintiffs and Class members through its website and packaging that the M1 MacBooks were functional, premium products, including references to the M1 MacBook Air as the "thinnest, lightest notebook," and to the MacBook Pro's "refuned scissor mechanism [of the Magic Keyboard] delivers a responsive, comfortable, and quiet typing experience," without disclosing facts that would have materially qualified those partial representations; and

c.  Apple promoted the high quality and premium features of the MacBook, including the display, despite knowing the MacBook is defective, and failed to correct its misleading partial disclosures.

186.  Apple had ample means and opportunities to alert Plaintiffs and Class members of the Clearance Defect, including on Apple's MacBook and MacBook Pro webpages; in its advertisements of the MacBook; on the MacBook's external packaging; and as part of the standardized MacBook setup process.  Apple uniformly failed to disclose that the MacBook is defective.  Had Apple disclosed that the MacBook is defective, Plaintiffs and Class members would not have purchased a MacBook, would not have purchased a MacBook at the prices they did, or would have returned their MacBook within the period in which they could have received a full refund.

187.  Apple was under a duty to disclose the Defect because of its exclusive and/or superior knowledge of the Defect before selling the MacBook, which knowledge stemmed from at least nine sources, including its own quality control and internal pre-release testing, repairs data, its internal product recall team, online reputation management, online consumer complaints, Apple's deletion of some of these consumer complaints, articles written on the subject, its August 27, 2021 statement, and its display patent application.

188.  Plaintiffs and Class members suffered injury in fact, including lost money or property, as a result of Apple's unlawful, unfair, and fraudulent acts and omissions, and the lack an adequate remedy at law to address the unfair conduct at issue here.  Legal remedies available to Plaintiffs and Class members are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief.  Damages are not equally certain as restitution because the standard that

1    governs restitution is different than the standard that governs damages.  Hence, the Court may award

2    restitution even if it determines that Plaintiffs fail to sufficiently adduce evidence to support an award

3    of damages.  Damages and restitution are not the same amount.  Unlike damages, restitution is not

4    limited to the amount of money defendant wrongfully acquired plus the legal rate of interest.

5    Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing,

6    even where the original funds taken have grown far greater than the legal rate of interest would

7    recognize.  Legal claims for damages are not equally certain as restitution because claims under the

8    UCL entail few elements.  In short, significant differences in proof and certainty establish that any

9    potential legal claim cannot serve as an adequate remedy at law.

10        189.    Through its unlawful, unfair, and fraudulent conduct, Apple acquired money directly

11   and as passed on by Apple's authorized resellers (i.e., Amazon, Best Buy).

12        190.    Plaintiffs and Class members accordingly seek appropriate relief, including (1)

13   restitution under the UCL and (2) such orders or judgments as may be necessary to enjoin Apple

14   from continuing its unfair, unlawful, and fraudulent practices.  Plaintiffs also respectfully seek

15   reasonable attorneys' fees and costs under applicable law, including under California Code of Civil

16   Procedure 1021.5.

## SECOND CAUSE OF ACTION
### Violation of California's Consumers Legal Remedies Act,
### Cal. Civ. Code § 1750, *et seq.*

19        191.    Plaintiffs incorporate by this reference the allegations contained in the preceding

20   paragraphs as if fully set forth herein.

21        192.    Plaintiffs assert this claim under California law on behalf of the Nationwide Class or,

22   in the alternative, the California Subclass.

23        193.    Apple is a "person" within the meaning of California Civil Code sections 1761(c) and

24   1770, and provided "goods" within the meaning of sections 1761(a) and 1770.

25        194.    Apple's acts and practices, as alleged in this complaint, violate California Civil Code

26   sections 1770(a)(5), (7) and (9) because they include unfair and deceptive acts and practices in

27   connection with transactions—the sale of defective laptops.  In violation of the CLRA, Apple:

28

a. Represented that the M1 MacBook had characteristics, uses, and benefits it does not have;

b. Represented that the M1 MacBook is of a standard, quality, or grade when in fact it is not; and

c. Advertised the MacBook with intent not to sell it as advertised.

195. Through its design, development, and pre-release testing of the display, as well as through repairs data, internal product recall team, online reputation management, consumer complaints, its deletion of consumer complaints, articles written on the topic, and Apple's August 27, 2021 statement, Apple knew that the MacBook's display is defective and prone to failure stemming from the Clearance Defect.

196. Apple was under a duty to disclose that the MacBook is defective because it had superior knowledge of the Defect—stemming from the sources of knowledge enumerated in the herein—and because it made partial, materially misleading representations about the MacBook's high quality and premium features, including the display.

197. Apple had ample means and opportunities to disclose to Plaintiffs and Class members that the MacBooks are defective, including through the Product Pages, on external packaging and in the accompanying documents, and during the laptop's setup process. Despite its exclusive and/or superior knowledge and opportunities to disclose the laptops' defective nature, Apple failed to disclose the Clearance Defect to Plaintiffs and Class members either prior to purchase or before Plaintiffs' and Class members could return their MacBooks for a full refund.

198. Apple's partial representations and/or omissions were material. Had Plaintiffs and Class members known that the MacBooks are defective, they would not have purchased the MacBook, would not have purchased it at the prices they did, or would have returned their MacBook during the period in which they could have received a full refund.

199. Under California Civil Code section 1782(a), on their own behalf and on behalf of the Class, Plaintiffs separately sent notices to Apple on September 13, 2021 and again on October 2, 2021 via letter sent by certified mail, return receipt requested to Apple's principal place of business, advising Apple of its violations and that it must correct, replace, or otherwise rectify the goods

1    alleged to be in violation.  Apple failed to correct its business practices or provide the requested relief

2    within 30 days.  Accordingly, Plaintiffs now seek monetary damages under the CLRA.

3          200.    Plaintiffs were injured by Apple's CLRA violations.  As a result, Plaintiffs are entitled

4    to actual damages in an amount to be proven at trial, reasonable attorneys' fees and costs, declaratory

5    relief and punitive damages.

6          201.    Plaintiffs and Class members suffered injury in fact, including lost money or property,

7    as a result of Apple's unlawful, unfair, and fraudulent acts and omissions, and the lack an adequate

8    remedy at law to address the unfair conduct at issue here.  Legal remedies available to Plaintiffs and

9    Class members are inadequate because they are not equally prompt and certain and in other ways

10   efficient as equitable relief.  Damages are not equally certain as restitution because the standard that

11   governs restitution is different than the standard that governs damages.  Hence, the Court may award

12   restitution even if it determines that Plaintiffs fail to sufficiently adduce evidence to support an award

13   of damages.  Damages and restitution are not the same amount.  Unlike damages, restitution is not

14   limited to the amount of money defendant wrongfully acquired plus the legal rate of interest.

15   Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing,

16   even where the original funds taken have grown far greater than the legal rate of interest would

17   recognize.  Legal claims for damages are not equally certain as restitution because claims under the

18   UCL entail few elements.  In short, significant differences in proof and certainty establish that any

19   potential legal claim cannot serve as an adequate remedy at law.

20         202.    In accordance with California Civil Code section 1780(d), Plaintiffs' CLRA venue

21   declarations are attached as Exhibit A to this complaint.

## THIRD CAUSE OF ACTION
### Violation of California's False Advertising Law,
### Cal. Bus. & Prof. Code § 17500, *et seq.*

24         203.    Plaintiffs incorporate by this reference the allegations contained in the preceding

25   paragraphs as if fully set forth herein.

26         204.    Plaintiffs bring this claim under California law on behalf of the Nationwide Class or,

27   in the alternative, the California Subclass.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

205.    Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive Class members and the public.  As described above, and throughout this Complaint, Defendant misrepresented the M1 MacBooks and concealed the Defect.

206.    By its actions, Defendant disseminated uniform advertising, including the Product Pages and the external packaging and accompanying material, and in the set-up process, regarding the MacBooks into California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq.*  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

207.    The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose the Clearance Defect and how its negatively impacts consumers' experience with the M1 MacBooks.

208.    Defendant continued to misrepresent to consumers that its M1 MacBooks in the manner described above when, in fact, that was not the case as described in detail throughout.

209.    In making and disseminating the statements alleged herein, Defendant knew, or should have known, that its advertisements were untrue and misleading in violation of California law.  Plaintiffs and other Class members based their purchasing decisions on Defendant' omitted material facts.  The revenue attributable to products sold in those false and misleading advertisements likely amounts to hundreds of millions of dollars.  Plaintiffs and Class members were injured in fact and lost money and property as a result.

210.    The partial representations and non-disclosures by Defendant of the material facts described and details herein constitute false and misleading advertising and, therefore, constitute violations of Cal. Bus. & Prof. Code § 17500, *et seq.*

211.    As a result of Defendant's wrongful conduct, Plaintiffs and Class members lost money in an amount to be proven at trial.  Plaintiffs and Class members are therefore entitled to restitution as appropriate for this cause of action.

212.    Plaintiffs and Class members suffered injury in fact, including lost money or property, as a result of Apple's unlawful, unfair, and fraudulent acts and omissions, and the lack an adequate remedy at law to address the unfair conduct at issue here.  Legal remedies available to Plaintiffs and

Class members are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief.  Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages.  Hence, the Court may award restitution even if it determines that Plaintiffs fail to sufficiently adduce evidence to support an award of damages.  Damages and restitution are not the same amount.  Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest.  Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize.  Legal claims for damages are not equally certain as restitution because claims under the UCL entail few elements.  In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

213.    Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

### FOURTH CAUSE OF ACTION
**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. § 501.201, *et seq.* ("FDUTPA")**

214.    Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

215.    Plaintiff Seveland asserts this claim under Florida law on behalf of himself and the Florida Subclass.

216.    Plaintiff Seveland and Florida Subclass members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

217.    Apple engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

218.    The FDUPTA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).

219.   Apple's acts and practices, described herein, are unfair in violation of Florida law in at least the following respects:

      a.   Apple promoted and sold laptops it knew were defective because they contain a display prone to failure as a result of the Clearance Defect;

      b.   Apple promoted and sold laptops with the Clearance Defect which caused the premature screen failures despite its knowledge that users do not expect the display to materially degrade over time;

      c.   Apple failed to disclose that the M1 MacBooks are defective, and omitted from its website and product packaging, amongst other sources that the MacBooks possess particular qualities that were inconsistent with Apple's actual knowledge of the products;

      d.   Apple failed to exercise adequate quality control and due diligence over the M1 MacBooks before placing them on the market; and

      e.   Apple minimized the scope and severity of the problems with the MacBook, refusing to acknowledge the true nature of the Clearance Defect and failing to provide adequate relief to consumers.

220.   Apple also engaged in deceptive trade practices in violation of Florida law by lauding the M1 MacBook display while willfully partially representing and/or failing to disclose and actively concealing the display's defective nature.

221.   Apple committed deceptive acts and practices with the intent that consumers, such as Plaintiff Seveland and Florida Subclass members, would rely upon Apple's representations and omissions when deciding whether to purchase a MacBook.

222.   Plaintiff Seveland and Florida Subclass members suffered from ascertainable loss as a direct and proximate result of Apple's unfair and deceptive acts or practices.  Had Plaintiff Seveland and Florida Subclass members known of the Clearance Defect, they would not have purchased the MacBook, would have paid significantly less for the MacBook, or would have returned it within the period in which they could have for a full refund.  Among other injuries, Plaintiff

1   Seveland and Florida Subclass members overpaid for their MacBook, and their MacBook suffered a

2   diminution in value.

3        223.    Plaintiff Seveland and Florida Subclass members are entitled to recover their actual

4   damages, under Fla. Stat. § 501.211(2), and reasonable attorneys' fees under Fla. Stat. § 501.2105(1).

5        224.    Plaintiff Seveland also seeks an order enjoining Apple's unfair and deceptive

6   practices pursuant to Fla. Stat. § 501.211, and any other just and proper relief available under the

7   FDUTPA.

8   **FIFTH CAUSE OF ACTION**<br>**Violation of the Massachusetts Consumer Protection Act,**<br>**Mass. Gen. Laws Ann. Ch. 93A, §§ 1, *et seq.***

9

10        225.    Plaintiffs incorporate by this reference the allegations contained in the preceding

11   paragraphs as if fully set forth herein.

12        226.    Plaintiff Sherman asserts this claim under Massachusetts law on behalf of herself and

13   the Massachusetts Subclass.

14        227.    Apple and Massachusetts Subclass members are "persons" as meant by Mass. Gen.

15   Laws. Ann. Ch. 93A, § 1(a).

16        228.    Apple operates in "trade or commerce" as meant by Mass. Gen. Laws Ann. Ch. 93A,

17   § 1(a).

18        229.    Apple advertised, offered, or sold goods or services in Massachusetts and engaged in

19   trade or commerce directly or indirectly affecting the people of Massachusetts, as defined by Mass.

20   Gen. Laws Ann. Ch. 93A, § 1(b).

21        230.    Demand for relief as required by Mass. Gen. Laws Ann. Ch. 93A § 9(3) was sent to

22   Apple on October 2, 2021 via certified mail, returned receipt requested.  Apple did not remedy its

23   unfair and deceptive acts and practices, nor did it offer relief to the Class members by way of

24   settlement or judgment.

25        231.    Apple engaged in unfair methods of competition and unfair and deceptive acts and

26   practices in the conduct of trade or commerce, in violation of Mass. Gen. Laws Ann. Ch. 93A § 2(a).

27        232.    Apple's acts and practices were "unfair" in at least the following respects:

28

a.     Apple promoted and sold laptops it knew were defective because they contain a display prone to failure as a result of the Clearance Defect;

b.     Apple promoted and sold laptops with the Clearance Defect which caused the premature display failures despite its knowledge that users do not expect the display to materially degrade over time;

c.     Apple failed to disclose that the M1 MacBooks are defective, and omitted from its website and product packaging, amongst other sources that the MacBooks possess particular qualities that were inconsistent with Apple's actual knowledge of the products;

d.     Apple failed to exercise adequate quality control and due diligence over the M1 MacBooks before placing them on the market; and

e.     Apple minimized the scope and severity of the problems with the MacBook, refusing to acknowledge the true nature of the Clearance Defect and failing to provide adequate relief to consumers.

233.     Consumers could not have reasonably avoided injury because Apple's business acts and practices unreasonably created or took advantage of an asymmetry of information in which it had superior knowledge of the Defect, precluding consumers from taking action to avoid or mitigate injury.

234.     Apple's omissions and/or partial representations had no countervailing benefit to consumers or to competition as demonstrated by the fact that other models do not suffer from the Clearance Defect.

235.     Apple intended to mislead Plaintiff Sherman and the Massachusetts Subclass members and induce them to rely on its misrepresentations and/or omissions. Apple's representations and/or omissions were material because they were likely to deceive reasonable consumers.

236.     Apple acted intentionally, knowingly, and maliciously to violate Massachusetts's Consumer Protection Act, and recklessly disregarded Plaintiff Sherman and Massachusetts Subclass members' rights. Apple's knowledge stemming from repairs, complaints made directly to Apple,

online complaints and its deletion of those complaints, its quality control and pre-release testing, online reputation management, and articles published by respected journalists, as well as its August 27, 2021 statement would have put it on notice that the M1 MacBook were not as advertised.

237.    As a direct and proximate result of Apple's unfair and deceptive practices, Plaintiff Sherman and Massachusetts Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.  Had Plaintiff Sherman and Massachusetts Subclass members known of the Clearance Defect, they would not have purchased the MacBook or would have paid significantly less for the MacBook.  Among other injuries, Plaintiff Sherman and Massachusetts Subclass members overpaid for their MacBook, and their MacBook suffered a diminution in value.

238.    Plaintiff Sherman and Massachusetts Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, double or treble damages, injunctive or other equitable relief, and attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**
**Violation of the New Jersey Consumer Fraud Act,**
**N.J. Stat. Ann. § 56:8-1, *et seq.* ("NJFCA")**

239.    Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

240.    Plaintiffs Almeida, LaVecchia, and Henderson bring this claim under New Jersey law individually and on behalf of the proposed New Jersey Subclass.

241.    Plaintiffs Almeida, LaVecchia, Henderson and New Jersey Subclass members, and Apple are "persons" within the meaning of N.J. Stat. Ann. § 56:801(d).

242.    Apple's advertisements discussed herein are "advertisements" within the meaning of N.J. Stat. Ann. § 56:801(a).

243.    The M1 MacBook is "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c).

244.    Apple's sales of the M1 MacBook constitute "sales" within the meaning of N.J. Stat. Ann. § 56:8-1(e).

245.    New Jersey prohibits "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . ." N.J. Stat. Ann. § 56:8-2.

246.    Apple employed unconscionable commercial practices in its advertising and sale of the M1 MacBook.  Apple's practices in connection with its advertising and sale of the M1 MacBook entailed a lack of honesty and fair dealing.

247.    Apple also engaged in deceptive trade practices in violation of New Jersey law, by promoting the M1 MacBook's screen while failing to disclose and actively concealing the screen's defective nature.

248.    Apple intended for others to rely upon its concealment of the M1 MacBook's defective nature when purchasing the laptop.

249.    Plaintiffs Almeida, LaVecchia, Henderson and New Jersey Subclass members suffered ascertainable loss as a direct and proximate result of Apple's unconscionable and deceptive acts or practices.  Had Plaintiffs Almeida, LaVecchia, Henderson and New Jersey Subclass members known of the Clearance Defect, they would not have purchased the MacBook or would have paid significantly less for it.  Among other injuries, Plaintiffs Almeida, LaVecchia, Henderson and New Jersey Subclass members overpaid for their M1 MacBook, and their MacBook suffered a diminution in value.

**SEVENTH CAUSE OF ACTION**
**Violation of the New York General Business Law § 349,**
**N.Y. Gen. Bus. Law § 349**

250.    Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

251.    Plaintiffs Angeles and Inselmann bring this claim under New York law individually and on behalf of the proposed New York Subclass.

252.    Plaintiffs Angeles and Inselmann and New York Subclass members are "persons" within the meaning of the New York General Business Law ("GBL"). N.Y. Gen. Bus. Law § 349(h).

253.    Apple is a "person, firm, corporation or association or agent or employee thereof" within the meaning of the GBL. NY. Gen. Bus. Law § 349(b).

254.    Under GBL section 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce" are unlawful.

255.    In the course of Apple's business, it failed to disclose and actively concealed the Defect in the MacBook with the intent that consumers rely on that concealment in deciding whether to purchase the MacBook.

256.    By intentionally concealing the Defect while advertising the M1 MacBook display as superior and high quality, Apple engaged in deceptive acts or practices in violation of GBL section 349.

257.    Apple's deceptive acts or practices were materially misleading.  Apple's conduct was likely to and did deceive reasonable consumers, including Plaintiffs Angeles and Inselmann, about the true performance and value of the MacBook.

258.    Plaintiffs Angeles and Inselmann and New York Subclass members were unaware of, and lacked a reasonable means of discovering, the material facts that Apple suppressed.

259.    Apple's actions set forth above occurred in the conduct of trade or commerce.

260.    Apple's misleading conduct concerns widely purchased consumer products and affects the public interest.  Apple's conduct includes unfair and misleading acts or practices that have the capacity to deceive consumers and are harmful to the public at large.

261.    Plaintiffs Angeles and Inselmann and New York Subclass members suffered ascertainable loss as a direct and proximate result of Apple's GBL violations.  Plaintiffs Angeles and Inselmann and New York Subclass Members are entitled to recover their actual damages or $500, whichever is greater.  Additionally, because Apple acted willfully or knowingly, Plaintiffs Angeles and Inselmann and New York Subclass members are entitled to recover three times their actual knowledge.  Plaintiffs are also entitled to reasonable attorneys' fees.

**EIGHTH CAUSE OF ACTION**
**Violation of the New York General Business Law § 350,**
**N.Y. Gen. Bus. Law § 350**

262.    Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

263.    Plaintiffs Angeles and Inselmann bring this claim under New York law individually and on behalf of the proposed New York Subclass.

264.    N.Y. Gen. Bus. Law § 350 provides, in part, as follows:  False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

265.    N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual …

266.    Apple's labeling and advertisements of the M1 MacBook were false and misleading in a material way, via partial representations and/or omissions as Apple failed to reveal material facts in light of such representations or conduct.

267.    Specifically, Apple advertised the superior abilities of the M1 MacBook display while omitting material information concerning the Clearance Defect.

268.    This misrepresentation has resulted in consumer injury or harm to the public interest.

269.    As a result of these omissions, Plaintiffs Angeles and Inselmann and members of the New York Subclass have suffered economic injury because (a) they would not have purchased the M1 MacBooks had they known the truth, and (b) they overpaid for the M1 MacBooks on account of the partial representations and/or omissions.

270.    By reason of the foregoing and as a result of Apple's conduct, Plaintiffs Angeles and Inselmann and the New York Subclass seek to enjoin the unlawful acts and practices described

herein, to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**NINTH CAUSE OF ACTION**
**Violation of the North Carolina Consumer Protection Act,**
**N.C. Gen. Stat. § 75-1.1, *et. seq.***

271.    Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

272.    Plaintiff West-Davis brings this claim under North Carolina law individually and on behalf of the proposed North Carolina Subclass.

273.    Plaintiff West-Davis and the members of the North Carolina Subclass are consumers who purchased Apple M1 MacBooks, which are consumer goods.

274.    Plaintiff West-Davis and the members of the North Carolina Subclass are entitled to the protections of the Consumer Protection Act, N.C. Gen. Stat. § 75-1.1, *et. seq.* (the "Act") and may recover damages pursuant to the provisions of the Act.

275.    N.C. Gen. Stat. § 75-1.1 makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

276.    Defendant engaged in unfair methods of competition in or affecting commerce, and unfair or deceptive acts and/or practices in or affecting commerce, through their advertisements on the Product Pages, external packaging and accompanying documents, and the set-up process for the M1 MacBooks, by partially representing and omitting material information to Plaintiff and members of the North Carolina Subclass. Such pattern of conduct was uniform in nature with respect to the marketing and sale of the laptops.

277.    Defendant's partial representations and/or omissions possessed the tendency or capacity to mislead or create the likelihood of deception.

278.    Defendant's partial representations and/or omissions were and are unfair because they offend established public policy.

279.    Defendant's acts and/or omissions were and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

280.   Defendant's acts and/or omissions were and are unfair because they amount to an inequitable assertion of their power or position.

281.   Until the present, Defendant knowingly accepted the benefits of their deception and improper conduct in the form of profits from the increased sale of the Apple M1 MacBooks and/or paid repair services.

282.   As a proximate result of the above-described Consumer Protection Act violations, Plaintiff West-Davis and members of the North Carolina Subclass: (a) purchased and used Apple M1 MacBooks when they would not otherwise have done so or could have returned it within the period in which they could have done so for a full refund; (b) suffered economic losses consisting of the Apple M1 MacBooks' cost of purchase or, alternatively, the diminished value of the Apple M1 MacBooks with the defect; (c) suffered and/or will suffer additional economic losses in purchasing another laptop and/or out of pocket repair costs; and (d) suffered and/or will suffer additional economic losses incidental to the defect.

283.   As a direct and proximate result of these unfair, deceptive and unconscionable commercial practices, Plaintiff West-Davis and the members of the North Carolina Subclass have been damaged in an amount in excess of $10,000, and are entitled under N.C. Gen. Stat. § 75-16 to recover treble damages as well as attorneys' fees and costs.

**TENTH CAUSE OF ACTION**
**Violation of the Rhode Island Deceptive Trade Practices Act,**
**R.I. Gen. Laws §§ 6-13.1, *et. seq.***

284.   Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

285.   Plaintiff Medbery brings this claim under Rhode Island law, individually and on behalf of the proposed Rhode Island Subclass.

286.   Plaintiff Medbery and Rhode Island Subclass members are each a "person," as defined by R.I. Gen. Laws § 6-13.1, 1-1(3).

287.   Plaintiff Medbery and Rhode Island Subclass members purchased goods and services for personal, family, or household purposes.

288.     Apple advertised, offered, or sold good or services in Rhode Island and engaged in trade or commerce directly or indirectly affecting the people of Rhode Island, as defined by R.I. Gen. Laws § 6-13.1-1(5).

289.     Apple engaged in unfair and deceptive acts and practices, in violation of R.I. Gen. Laws § 6-13.1-2, including:

a.     Representing that its goods and services have characteristics, uses, and benefits that they do not have (R.I. Gen. Laws § 6-13.1-52(6)(v));

b.     Representing that its goods and services are of a particular standard or quality when they are of another (R.I. Gen. Laws § 6-13.1-52(6)(vii));

c.     Advertising goods or services with intent not to sell them as advertised (R.I. Gen. Laws § 6-13.1-52(6)(ix));

d.     Engaging in any other conduct that similarly creates a likelihood of confusion or misunderstanding (R.I. Gen. Laws § 6-13.1-52(6)(xiii));

e.     Engaging in any act or practice that is unfair or deceptive to the consumer (R.I. Gen. Laws § 6-13.1-52(6)(xiii)); and

f.     Using other methods, acts, and practices that mislead or deceive members of the public in a material respect (R.I. Gen. Laws § 6-13.1-52(6)(xiv)).

290.     Apple's partial representations and/or omissions were material because they were likely to deceive reasonable consumers.

291.     Apple intended to mislead Plaintiff Medbery and Rhode Island Subclass members and induce them to reply on its misrepresentations and omissions.

292.     Apple acted intentionally, knowingly, and maliciously to violate Rhode Island's Deceptive Trade Practices Act, and recklessly disregarded Plaintiff Medbery and Rhode Island Subclass members' rights.  Apple's knowledge stemming from at least nine sources, including its own quality control and internal pre-release testing, repairs data, its internal product recall team, online reputation management, online consumer complaints, Apple's deletion of some of these consumer complaints, articles written on the subject, its August 27, 2021 statement its display patent application would have put it on notice that the M1 MacBooks were not as advertised.

293.    As a direct and proximate result of Apple's unfair and deceptive acts, Plaintiff Medbery and Rhode Island Subclass members have suffered ascertainable losses of money or property, and monetary and non-monetary damages.  Had Plaintiff Medbery and Rhode Island Subclass members known of the Clearance Defect, they would not have purchased the MacBook, would have paid significantly less, or would have returned it within the period in which she could have done so for a full refund.  Among other injuries, Plaintiff Medbery and Rhode Island Subclass members overpaid for their M1 MacBook, and their MacBook suffered a diminution in value.

294.    Plaintiff Medbery and Rhode Island Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $200 per Rhode Island Subclass member (whichever is greater), punitive damages, injunctive relief, other equitable relief, and attorneys' fees and costs.

## ELEVENTH CAUSE OF ACTION
### Violation of the Virginia Consumer Protection Act,
### Va. Code Ann. §§ 59.1-196, *et. Seq.* ("VCPA")

295.    Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

296.    Plaintiff Colindrez brings this claim under Virginia law individually and on behalf of the Virginia Subclass.

297.    The VCPA prohibits "[u]sing any . . . deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."  Va. Code Ann. § 59.1-200(14).

298.    Apple is a "person," as defined by Va. Code Ann. § 59.1-198.

299.    Apple is a "supplier," as defined by Va. Code Ann. § 59.1-198.

300.    Apple engaged in the complained-of conduct in connection with "consumer transactions" with regards to "goods" and "services," as defined by Va. Code Ann. § 59.1-198.  Apple advertised, offered, or sold goods or services used primarily for personal, family, or household purposes.

301.    Apple engaged in deceptive acts and practices by using deception, fraud, false pretenses, false promise, and misrepresentation in connection with consumer transactions as described herein.

302.    Apple intended to mislead Plaintiff Colindrez and Virginia Subclass members and induce them to rely on its misrepresentations and/or omissions.

303.    Apple's representations and/or omissions were material because they were likely to deceive reasonable consumers.

304.    Had Apple disclosed that it partially represented the M1 MacBook, omitted material information regarding the defect, and otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the Defect.  Plaintiff Colindrez and Virginia Subclass members acted reasonably in relying on Apple's partial representations and/or omissions, the truth of which they could not have discovered.

305.    Apple had a duty to disclose the above-described facts due to the circumstances of this case.  Apple's duty to disclose also arose from its:

    a.    Possession of exclusive and/or superior knowledge regarding the Defect in the M1 MacBook;

    b.    Active concealment regarding the Clearance Defect; and

    c.    Incomplete representations about the MacBooks, while purposefully withholding material facts from Plaintiff Colindrez and the Virginia Subclass that contradicted these representations.

306.    The above-described deceptive acts and practices also violate the following provisions of VA Code § 59.1-200(A):

    a.    Misrepresenting that goods or services have certain qualities, characteristics, ingredients, uses, or benefits;

    b.    Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; and

    c.    Advertising goods or services with intent not to sell them as advertised, or with intent not to sell them upon the terms advertised.

307.    Apple acted intentionally, knowingly, and maliciously to violate Virginia's Consumer Protection Act, and recklessly disregarded Plaintiff Colindrez and Virginia Subclass members' rights.  Apple's knowledge stemming from at least nine sources, including its own quality control

and internal pre-release testing, repairs data, its internal product recall team, online reputation management, online consumer complaints, Apple's deletion of some of these consumer complaints, articles written on the subject, its August 27, 2021 statement, and its display patent application would have put it on notice that the M1 MacBooks were not as advertised.  In light of this conduct, punitive damages would serve the interest of society in punishing and warning others not to engage in such conduct and would deter Apple and others from committing similar conduct in the future.

308. As a direct and proximate result of Apple's unfair and deceptive acts or practices, Plaintiff Colindrez and Virginia Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the M1 MacBook and the time and expense of dealing with repairs and replacements that are not covered under Apple's limited-one year warranty.

309. Apple's violations present a continuing risk to Plaintiff Colindrez and Virginia Subclass members as well as to the general public.

310. Plaintiff Colindrez and Virginia Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages; statutory damages in the amount of $1,000 per violation if the conduct is found to be willful or, in the alternative, $500 per violation, restitution, injunctive relief, punitive damages, and attorneys' fees and costs.

## TWELFTH CAUSE OF ACTION
### Fraud

311. Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

312. Plaintiffs bring this claim on behalf of the Nationwide Class under California law or, alternatively, the law of the state in which each respective Plaintiff purchased their M1 MacBook.

313. At the time Plaintiffs and Class members purchased their M1 MacBook and during the period in which they could have returned them for a full refund, Defendant did not disclose, but instead concealed and partially represented, the Clearance Defect as discussed herein.

314.    Apple partially represented certain features of the MacBooks while withholding information that would have materially qualified facts voluntarily introduced.

315.    Apple knew that its omissions and/or partial representations regarding the M1 MacBook and the Defect were material, and that a reasonable consumer would rely upon Defendant's partial representations and/or omissions in making purchasing decisions.

316.    Plaintiffs and Class members did not know—nor could they have known through reasonable diligence—about the Defect.

317.    Plaintiffs and Class members would have been reasonable in relying on Defendant's misrepresentations (and/or corresponding omissions) in making their purchase and return decisions.

318.    Plaintiffs and Class members had a right to rely upon Defendant's partial representations and/or omissions as Defendant maintained exclusive and/or superior control over knowledge of the true quality of the M1 MacBook and of the Defect.

319.    Plaintiffs and Class members sustained damages as a result of their reliance on Apple's omissions and/or partial representations, thus causing Plaintiffs and Class members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## THIRTEENTH CAUSE OF ACTION
### Constructive Fraud

320.    Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

321.    Plaintiffs bring this claim on behalf of the Nationwide Class under California law or, alternatively, the law of the state in which each respective Plaintiff purchased their M1 MacBook.

322.    At the time Plaintiffs and Class members purchased their M1 MacBook and within the period in which they could have turned their MacBooks for a full refund, Defendant did not disclose, but instead concealed and/or partially misrepresented the M1 MacBook as discussed herein.

323.    Apple partially represented certain features of the MacBooks while withholding information that would have materially qualified facts voluntarily introduced.

324.    Apple also knew that its partial representations and/or omissions regarding the Clearance Defect were material, and that a reasonable consumer would rely upon Defendant's partial representations and/or omissions in making purchasing decisions.

325.    Apple had an obligation not to omit or partially represent the M1 MacBooks or the Defect because: (a) it was in the exclusive and/or superior possession of such information; (b) it made partial representations; (c) Plaintiffs and Class members relied on Defendant's representations and/or omissions, and were reasonable in doing so based on the relationship between Apple and purchasers.

326.    Plaintiffs and Class members did not know—nor could they have known through reasonable diligence—about the Clearance Defect.

327.    Plaintiffs and Class members would have been reasonable in relying on Apple's partial representations and/or omissions in making their purchasing decisions.

328.    Plaintiffs and Class members had a right to rely upon Apple's partial representations and/or omissions as Defendant maintained exclusive and/or superior control over knowledge of the true quality of the M1 MacBook and of the Clearance Defect, and what information was available regarding the Defect.

329.    Apple breached its duty to Plaintiffs and Class members to make full disclosures of the Defect.

330.    Plaintiffs and Class members sustained damages as a result of their reliance on Defendant's partial representations and/or omissions, and Defendant's breach of its duty, thus causing Plaintiffs and Class members to sustain actual losses and damages in a sum to be determined at trial.

## FOURTEENTH CAUSE OF ACTION
### Fraudulent Inducement

331.    Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

332.    Plaintiffs bring this claim on behalf of the Nationwide Class under California law or, alternatively, the law of the state in which each respective Plaintiff purchased their M1 MacBook.

333.   Apple did not disclose, but instead concealed and/or misrepresented, the Defect as discussed herein.

334.   Apple knew, or should have known, of the Clearance Defect and that knowledge of the Defect was withheld from the consumer public.

335.   Apple also knew that its partial representations and/or omissions were material, and that a reasonable consumer would rely on Apple's partial representations and/or omissions in making purchase and return decisions.

336.   Plaintiffs and Class members did not know—nor could they have known through reasonable diligence—about the Clearance Defect.

337.   Plaintiffs and Class members would have been reasonable in relying on Apple's partial representations and/or omissions in making their purchasing decisions.

338.   Plaintiffs and Class members had a right to rely on Apple's partial representations and/or corresponding omissions as Apple maintained exclusive and/or superior control over the Defect, and what information was available regarding the Defect.

339.   Apple intended to induce—and did, indeed, induce—Plaintiffs and Class members into purchasing the MacBooks based upon their partial representations and/or omissions.

340.   Plaintiffs and Class members sustained damages as a result of their reliance on Apple's partial representations and/or omissions, thus causing Plaintiffs and Class members to sustain actual losses and damages in a sum to be determined at trial.

## FIFTEENTH CAUSE OF ACTION
### Fraudulent Concealment

341.   Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

342.   Plaintiffs bring this claim individually and on behalf of the Nationwide Class under California law or, alternatively, the law of the state in which each respective Plaintiff purchased their M1 MacBook.

343.   Apple intentionally suppressed and concealed material facts, namely the Clearance Defect.  As alleged herein, Apple knew or should have known of the Clearance Defect.  Further,

1    Apple was aware of numerous consumer complaints concerning the Defect, but never disclosed the

2    defect to Plaintiffs and Class members.

3        344.    Because the Defect in the M1 MacBook is latent and unobservable until it arises,

4    Plaintiffs and Class members had no reasonable means of knowing that Apple's representations

5    concerning the M1 MacBook were incomplete, false, or misleading, or that it had failed to disclose

6    that the MacBook is defective.  Plaintiffs and Class members did not and reasonably could not have

7    discovered Apple's deceit before they purchased the M1 MacBook or before the end of their buyer's

8    remorse periods.

9        345.    Had Plaintiffs and Class members known that the M1 MacBook is defective, they

10    would not have purchased a MacBook, would not have purchased it at the price they did, or would

11    have returned it during their respective buyer's remorse periods.

12        346.    Apple had a duty to disclose the Defect because the Defect is material and Apple

13    possessed exclusive and/or superior knowledge of it stemming from repairs, complaints made

14    directly to Apple, online complaints and its deletion of those complaints, its quality control and pre-

15    release testing, online reputation management, its display patent application, and articles published

16    by respected journalists, as well as its August 27, 2021 statement.

17        347.    Apple also had a duty to disclose the Defect because, through advertising on the

18    Product Pages and in the external packaging and accompanying materials and during the set-up

19    process, and in other sources that Plaintiffs and Class members encountered before purchasing their

20    laptops, Apple made partial representations and/or failed to disclose facts that would have materially

21    qualified these partial representations.  Having volunteered information relating to the MacBooks'

22    display to Plaintiffs and Class members, Apple had a duty to disclose the whole truth about the

23    display and, in particular, its defective nature.

24        348.    Plaintiffs were exposed to Apple's specific representations about the M1 MacBook

25    before and immediately after purchase and within the time period in which they could have returned

26    their M1 MacBooks without penalty.  Plaintiffs saw Apple's representations about the M1 MacBook

27    online, in the external packaging and accompanying material, and during the setup process.  None of

28    the informational sources Plaintiffs encountered indicated that the M1 MacBook are defective.

349.   Apple concealed the Defect to sell more M1 MacBooks at a premium price, prevent damage to its brand, and avoid the costs of developing a fix for the Defect and of repairs, replacements, and refunds under its Warranty.

350.   The facts about the M1 MacBook display that Apple suppressed and omitted were material, and Plaintiffs and Class members were unaware of them until they experienced the Defect. Had Apple disclosed the Clearance Defect, including on the Product Pages, the packaging and accompanying materials, or the initial setup process, Plaintiffs and Class members would not have purchased an M1 MacBook, would have paid substantially less for it, or would have returned it for a refund.

351.   When deciding to purchase a MacBook, Plaintiffs and Class members reasonably relied to their detriment upon Apple's partial representations and/or omissions regarding the quality of the M1 MacBook and the absence of a product defect.

352.   Plaintiffs and Class members sustained damages as a direct and proximate result of Apple's deceit and fraudulent concealment.  Among other damages, Plaintiffs and Class members did not receive the value of the premium price they paid for the M1 MacBook.

353.   Apple's fraudulent concealment was malicious, oppressive, deliberate, and in reckless disregard of Plaintiffs' and Class members' rights, interests, and well-being.  Apple's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct, to be determined according to proof.

## SIXTEENTH CAUSE OF ACTION
### Negligent Misrepresentation

354.   Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

355.   Plaintiffs bring this claim individually and on behalf of the Nationwide Class under California law or, alternatively, the law of the state in which each respective Plaintiff purchased their M1 MacBook.

356.   Apple had a duty to provide honest and accurate information to its customers so that customers could make informed decisions on the substantial purchase of the MacBook and the

1   decision to return said MacBook.

2   357.   Apple negligently and recklessly omitted certain material facts regarding the M1

3   MacBooks.  Apple failed to warn consumers that their M1 MacBooks contained a material Defect

4   that resulted in the display not performing as advertised.

5   358.   The advertisements which were made expressly through uniform representations from

6   Apple were material and would have been considered by a reasonable consumer, including Plaintiffs,

7   in making purchasing decisions.

8   359.   Plaintiffs and Class members acquired M1 MacBooks believing they would function

9   as advertised.

10   360.   As a result, Plaintiffs and Class members were directly and proximately injured by

11   Apple's negligence in failing to inform Plaintiffs and Class members of the material Defect in the

12   M1 MacBook as it relates to the display.  Accordingly, Plaintiffs and Class members are entitled to

13   damages in an amount to be proven at trial.

14   **SEVENTEENTH CAUSE OF ACTION**
     **Quasi-Contract / Unjust Enrichment**

15

16   361.   Plaintiffs incorporate by this reference the allegations contained in the preceding

17   paragraphs as if fully set forth herein.

18   362.   Plaintiffs bring this claim individually and on behalf of the Nationwide Class under

19   California law or, alternatively, the law of the state in which each respective Plaintiff purchased their

20   M1 MacBook.

21   363.   Plaintiffs and Class members purchased the M1 MacBooks from Apple, which were

22   not as Apple represented them to be, enticing Plaintiffs and the Class to purchase the MacBooks, and

23   to not return them within the period in which they could have received a full refund.  Had Plaintiffs

24   and the Class known of the Clearance Defect, they would have paid less for their MacBooks and

25   would not have paid for repairs or services caused by the Defect.

26   364.   Accordingly, Plaintiffs and Class members were damaged, and Apple was unjustly

27   enriched by the purchase price of the MacBooks.

28   365.   Plaintiffs and Class members are therefore entitled to damages in an amount Apple

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                          74
CASE NO. 3:21-CV-07109-VC

was unjustly enriched, to be determined at trial.

366.   Moreover, Apple's conduct was willful, intentionally deceptive, and tended to cause economic injury to Plaintiffs and the Class.  Apple is therefore liable to pay punitive damages.

367.   In every contract or agreement there is an implied promise of good faith and fair dealing under California law and of the laws of the states where non-California Plaintiffs purchased their computers.

368.   This form of equitable relief is appropriate as legal remedies available to Plaintiffs and Class members are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief.  Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages.  Hence, the Court may award restitution even if it determines that Plaintiffs fail to sufficiently adduce evidence to support an award of damages.  Damages and restitution are not the same amount.  Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest.  Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize.  Legal claims for damages are not equally certain as restitution because claims under the UCL entail few elements.  In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and as representatives of all other persons similarly situated, prays for judgment against Apple, as follows:

A.   An order certifying that the action may be maintained as a Class Action under Fed. R. Civ. P. 23;

B.   Award all actual, general, special, incidental, statutory, punitive, and consequential damages and/or restitution to which Plaintiffs and Class members are entitled;

C.   Award pre-judgment and post-judgment interest as provided by law;

D.   Grant appropriate equitable relief, including, without limitation, an order requiring

1     Apple to: (1) adequately disclose the defective nature of the M1 MacBook; and (2) return to Plaintiffs

2     and Class members all costs attributable to remedying or replacing the M1 MacBook, including but

3     not limited to economic losses from the purchase or replacement laptops or screens;

4         E.      Award reasonable attorneys' fees and costs as permitted by law; and

5         F.      Grant such other and further relief as the Court deems appropriate.

6                         **DEMAND FOR JURY TRIAL**

7     Plaintiffs hereby demand a jury trial on all issues so triable.

8

9   Dated:  June 17, 2022           **BURSOR & FISHER, P.A**.

10                By:     */s/ L. Timothy Fisher*
                        L. Timothy Fisher

11

12            L. Timothy Fisher (State Bar No. 191626)
           Sean L. Litteral (State Bar No. 331985)

13           1990 North California Blvd., Suite 940
           Walnut Creek, CA 94596

14           Telephone:  (925) 300-4455
           Facsimile:  (925) 407-2700

15           Email:  ltfisher@bursor.com
                  slitteral@bursor.com

16

           **MIGLIACCIO & RATHOD LLP**

17           Nicholas A. Migliaccio *(pro hac vice)*
           Jason S. Rathod *(pro hac vice)*

18           412 H St., NE
           Washington. D.C. 20002

19           Telephone: (202) 470-3520
           Facsimile:  (202) 800-2730

20           E-Mail: nmigliaccio@classlawdc.com
                  jrathod@classlawdc.com

21           *Attorneys for Plaintiffs*

22

23

24

25

26

27

28

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, L. Timothy Fisher, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs Daniel Friend, Daphne Pareas, Scott Seveland, Patrice Sherman, Nestor Almeida, Adelina LaVecchia, Dan Henderson, Maritza Angeles, Tim Inselmann, William West-Davis, Patricia Medberry, and Handy Colindrez.  Plaintiff Friend resides in Fullerton, California.  Plaintiff Pareas resides in Los Altos, California.  Plaintiff Seveland resides in Pompano Beach, Florida.  Plaintiff Sherman resides in Cambridge, Massachusetts.  Plaintiff Almeida resides in Belleville, New Jersey. Plaintiff LaVecchia resides in Middlesex, New Jersey.  Plaintiff Henderson resides in Williamstown, New York.  Plaintiff Angeles resides in New York, New York.  Plaintiff Inselmann resides in Center Moriches, New York.  Plaintiff West-Davis resides in King Mountain, North Carolina.  Plaintiff Medberry resides in Portsmouth, Rhode Island.  Plaintiff Colindrez resides in Woodbridge, Virginia. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California as Defendant intentionally availed itself of this District, conducts substantial business in this District, and is headquartered in this District.  As described above in Plaintiffs' Choice of Law Allegations, Defendant's conduct amounts to injury that Plaintiffs sustained in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California this 17th day of June, 2022.


     */s/ L. Timothy Fisher*
          L. Timothy Fisher